## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| QUALTEQ, INC., d/b/a VCT NEW JERSEY, INC., *et al.*,[1] | Case No. 11-12572 (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF ARUN VELUCHAMY, VICE PRESIDENT OF QUALTEQ, INC., IN SUPPORT OF FIRST DAY MOTIONS

Arun Veluchamy, being duly sworn, deposes and states:

1.    I am the Vice President of Qualteq, Inc., d/b/a VCT New Jersey, Inc. ("*VCT-NJ*") and am an officer, director, or member of all of the other debtors and debtors in possession (collectively, the "*Debtors*") in the above-captioned chapter 11 cases (collectively, the "*Chapter 11 Cases*"). I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.    On the date hereof (the "*Petition Date*"), VCT-NJ and a number of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). A full list of the names of all of the Debtors is set forth in Footnote 1 hereto. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Qualteq, Inc., d/b/a VCT New Jersey, Inc. (4600); (ii) 1400 Centre Circle, LLC (7091); (iii) 5200 Thatcher, LLC (6991); (iv) 5300 Katrine, LLC (6016); (v) Automated Presort, Inc. (0850); (vi) Avadamma LLC (4775; 4800; 4810; 4829); (vii) Creative Automation Company (4350); (viii) Creative Investments, a General Partnership (5992); (ix) Fulfillment Xcellence, Inc. (3461); (x) Global Card Services, Inc. (4581); (xi) Unique Data Services, Inc. (1068); (xii) Unique Embossing Services, Inc. (1043); (xiii) Unique Mailing Services, Inc. (2594); (xiv) University Subscription Service, Inc. (3669); (xv) Versatile Card Technology, Inc. (5258); (xvi) Veluchamy LLC (3434); and (xvii) Vmark, Inc. (5904).

3. In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses, the Debtors have requested various types of relief in certain "first day" applications and motions (each a "*First Day Motion*," and collectively, the "*First Day Motions*"). The First Day Motions seek relief aimed at, among other things, maintaining the Debtors' operations and going-concern value and bolstering employee morale. All of the First Day Motions are crucial to the Debtors' efforts to maintain the value of their estates for the benefit of their creditors during the course of these Chapter 11 Cases. Furthermore, the Debtors have filed a motion for entry of an order directing joint administration of the Debtors' Chapter 11 Cases, for procedural purposes only.

4. I submit this declaration (the "*Declaration*") in support of the First Day Motions. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations, financial condition, and present financial outlook. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

## Background

5. Collectively, the Debtors operate one of the largest vertically-integrated direct marketing businesses in North America, providing a full range of direct marketing services to numerous Fortune 500 companies, major national banks, and other well-known customers. The Debtors offer their customers a broad array of services – including database management and customization, customized printing, mail sorting and shipping, and plastic card production and personalization – from multiple state-of-the-art facilities in Illinois, Iowa, and New Jersey.

2

6.     The Debtors include the following entities:

**Qualteq, Inc., d/b/a VCT New Jersey, Inc. ("*VCT-NJ*"),** a Delaware corporation, together with VCT and VCT India (each defined below), is a multi-national manufacturer and world leader in plastic card production and related services. VCT-NJ can produce cards in a wide range of thicknesses and finishes, and can include a variety of materials to improve card durability and security (such as smart chips and encoding). VCT-NJ operates from a facility located in New Jersey.

**VCT, Inc. ("*VCT*"),** an Illinois corporation, provides largely the same services as VCT-NJ but operates from a facility located in Illinois as well as through its non-debtor Indian subsidiary ("*VCT India*").

**Global Card Services, Inc. ("*GCS*"),** an Illinois corporation, operates as a full-. service source for secured plastic card customization (such as for credit cards or other cards that carry a cash balance). GCS, the industry leader in the production of personalized plastic cards, custom card carriers, and plastic card labels, operates from a facility located in Illinois.

**Unique Embossing Services, Inc. ("*UES*"),** an Illinois corporation, provides high-speed embossing of all types of promotional and direct mail packages using state-of-the-art equipment (such as the latest in Video Jet imprinting) at a facility located in Illinois.

**Unique Data Services, Inc. ("*UDS*"),** an Illinois corporation, provides customized data processing services to customers, including extensive production services such as thermal imaging, plastic card embossing, and personalization of plastic cards (typically non-secure cards). UDS operates at a facility located in Illinois.

**Creative Automation Company ("*CAC*"),** an Illinois corporation, provides customers with cutting-edge database management and computer processing services, forms printing and personalization, and mailing of folding product for customers from a facility located in Illinois.

**Unique Mailing Services, Inc. ("*UMS*"),** an Illinois corporation, operates a full-service lettershop (complete with a United States Postal Service substation) and computerized warehouse where it provides services such as labeling, admarketing, metering, inserting, and promotional card affixing to its customers. UMS operates from a facility located in Illinois.

**Automated Presort, Inc. ("*API*"),** an Illinois corporation, uses multi-lined optical character readers to barcode, commingle by zip code (as requested by customers), and presort mail from over 250 customer mailings to optimize customer savings and delivery times. Automated Presort operates from facilities located in Illinois and Iowa.

3

**Fulfillment Xcellence, Inc.** (*"FXI"*), an Illinois corporation, serves as a project manager for the Debtors' direct marketing business, offering customers seeking to use services provided by more than one of the Debtors' companies the convenience of "one-stop shopping."

**University Subscription Services, Inc.** (*"USS"*), an Illinois corporation, markets magazine subscriptions largely to university students and faculty.

**Vmark, Inc.,** an Illinois corporation, serves largely as a holding company for certain of the other Debtor entities.

**Veluchamy, LLC,** an Illinois limited liability company, owns, without limitation, the real estate where VCT-NJ is headquartered.

**Creative Investments**, an Illinois general partnership, owns, without limitation, the real property where CAC is headquartered.

**1400 Centre Circle, LLC,** an Illinois limited liability company, owns, without limitation, the real property where API is headquartered.

**5200 Thatcher, LLC,** an Illinois limited liability company, owns, without limitation, the real property where VCT is headquartered.

**5300 Katrine, LLC,** an Illinois limited liability company, owns, without limitation, the real property where UDS is headquartered.

**Avadamma, LLC**, an Illinois limited liability company, owns, without limitation, real property where GCS, UES, and USS are headquartered and several other parcels of real property.

### *The Debtors' Corporate History and Equity Structure*

7.     Although the Debtors' trade name of "Vmark" is relatively recent, the first of the Vmark companies – Creative Automation Company – was actually established in 1969. Almost all of the other Debtors were formed and grown by Vmark's founders since that time, although CAC and VCT-NJ were acquired as mature businesses in 1981 and 2003 respectively.

8.     Today, the Debtors operate from nine domestic facilities with over 1,000,000 square feet of production space. The Debtors' approximately 1,370 employees – none unionized – executed over six billion marketing messages for customers in the past year alone, making them one of the largest direct marketing solution providers in North America.  The Vmark

4

companies also collectively constitute one of the nation's largest privately-held, minority-owned businesses and one of the largest minority certified suppliers in the United States – a certification that gives them a distinct advantage in marketing to major corporate clients.

9. The ownership statements attached to each Debtor's bankruptcy petition provide a detailed breakdown of each Debtor entity's ownership structure (including, to the extent applicable, in each class of stock).

### *The Debtors' Debt Structure*

10. Certain entities (collectively, the "*Lenders*") appear to assert security interests in cash or cash proceeds of other assets of the respective Debtors as follows:

| Entity | Debtor(s) |
|---|---|
| Amalgamated Bank of Chicago | Fulfillment Xcellence, Inc. |
| | Versatile Card Technology, Inc. |
| Burr Ridge Bank and Trust | Global Card Services, Inc. |
| Inland Bank | Unique Mailing Services, Inc. |
| Oakbrook Financial[2] | Creative Automation Company |
| | Unique Data Services, Inc. |
| | University Subscription Service, Inc. |
| Sterling Bank | VCT-NJ |

11. The following chart provides an overview of the Debtors' secured debt structure. All amounts set forth below are approximations and for informational purposes only:[3]

| Borrower | Lender | Approximate Loan Balance | Purported Collateral |
|---|---|---|---|

---

[2] For purposes of disclosure, the Debtors note that Oakbrook Financial is a finance company in which the spouse of one of the Debtors' principals has an interest.

[3] The Debtors anticipate calculating the correct amount of such debts – whether higher or lower than the estimates used herein – in connection with preparing their schedules, but have inserted the estimates herein (rounded to the nearest thousand) to give readers a rough idea of the Debtors' secured debt structure. As these amounts are estimates, they should not be relied on for any purpose, and the column labeled "purported collateral" should not be deemed to be an admission by the Debtors that any lenders are secured (or are secured in the collateral described above).

5

| API | BBH Financial Services | $216,000 | Equipment |
|-----|------------------------|----------|-----------|
| API | General Electric Capital Corporation | $826,000 | Equipment |
| API | Oakbrook Financial, Inc. | $136,000 | Equipment |
| | | | |
| CAC | Oakbrook Financial, Inc. | $3,600,000 | All of CAC's property and assets |
| | | | |
| FXI | Amalgamated Bank of Chicago | $4,000,000 | All of FXI's property and assets (co-borrower with VCT) |
| | | | |
| GCS | Burr Ridge Bank and Trust | $1,700,000 | All of GCS's property and assets |
| GCS | Western Springs National Bank and Trust | $225,000 | Equipment |
| GCS | Jules & Associates, Inc. | $255,000 | Equipment |
| GCS | Key Equipment Finance, Inc. | $140,000 | Equipment |
| | | | |
| UDS | Oakbrook Financial | $750,000 | All of UDS's property and assets |
| | | | |
| UES | N/A | N/A | N/A |
| | | | |
| UMS | Inland Bank | $600,000 | All of UMS's property and assets |
| UMS | Oakbrook Financial | $556,000 | Equipment |
| UMS | Oakbrook Financial | $176,000 | Equipment |
| UMS | Oakbrook Financial | $88,000 | Equipment |
| UMS | Pitney Bowes Credit Corporation and Pitney Bowes Global Financial Services, LLC | $320,000 | Multiple equipment liens |
| UMS | Key Equipment Finance Inc. | $257,000 | Equipment |
| | | | |
| USS | Oakbrook Financial | $256,000 | All of USS's property and assets |
| | | | |
| VCT | Amalgamated Bank of Chicago | $4,000,000 | All of VCT's property and assets (VCT is a co-borrower with FXI) |
| VCT | General Electric Capital Corporation | $366,000 | Equipment |
| VCT | GE Government Finance | $3,885,000 | Equipment |
| VCT | TCF Equipment Finance, Inc. | $62,000 | Equipment |
| VCT | Key Equipment Finance | $123,000 | Equipment |
| | | | |
| VCT-NJ | Sterling Bank | $3,700,000 | All of VCT-NJ's property and |

6

| | | | assets[4] |
|---|---|---|---|
| Vmark | N/A | N/A | N/A |
| 1400 Centre Circle, LLC | Inland Bank & Trust | $2,444,000 | Mortgage on real property owned by 1400 Centre Circle, LLC |
| 5200 Thatcher, LLC | The Northern Trust Company | $2,629,000 | All of 5200 Thatcher, LLC's rights under real estate trust agreement; mortgage on the underlying real property |
| 5300 Katrine, LLC | Burr Ridge Bank & Trust | $3,029,000 | Mortgage on real property owned by 5300 Katrine, LLC |
| Avadamma, LLC | MB Financial | $36,080,000 | Avadamma is a series LLC with four series, each of which has a separate FEIN number and owns a separate real estate asset through a trust. MB Financial asserts a security interest in the beneficial interest in each of the trusts and purports to hold mortgages on the underlying real estate assets |
| Creative Investments, LLC | Harris Bank | $4,200,000 | All of Creative Investments, LLC's property and assets, including real property |
| Veluchamy, LLC | Skylands Bank | $2,873,000 | First mortgage on real property owned by Veluchamy, LLC |
| | **ESTIMATED TOTAL** | **$66,419,000** | |

### *Events Leading to These Chapter 11 Cases*

12.     Although the Debtors have been historically profitable – generating a small operating profit on gross revenues of approximately $155 million in 2010 – in recent months the Debtors' businesses have been harmed by unrelated litigation and judgments against certain of

---

[4]      This debt is also secured by a second mortgage on real property owned by the Veluchamy, LLC.

7

the Debtors' shareholders. The Debtors' problems first arose in December of 2010 when Vasu and Jaganath Naidu (individual creditors of Debtor Vmark, Inc., who are owed approximately $1.23 million) and Rajiv Parthasarathy (an individual creditor of Debtor Versatile Card Technology, Inc. who is owed approximately $980,000) obtained judgments against Pethinaidu Veluchamy ("*Mr. Veluchamy*"), the Debtors' founder. Although unrelated to the Debtors, due to default provisions in certain of the Debtors' loan documents, millions of dollars in loans from numerous lenders – including BBH Financial Services (API), Key Equipment Finance (GCS), Key Equipment Finance (VCT), Key Equipment Finance (UMS), TCF (VCT), TD Bank (VCT-NJ), Inland Bank (UMS), Pitney Bowes (UMS), Broadway Bank-MB Financial (Avadamma LLC), Harris Bank (Creative Investments), Skyland Bank (Veluchamy LLC), Western Springs National Bank (GCS), and Western Springs National Bank (API) – were suddenly in default. These defaults and associated cross-defaults (due to cross-default provisions in other loan facilities) have caused a ripple of effects given that the Debtors collectively have at least 27 secured lenders (*see* chart above).

13. Although the damage was already done when the Naidu judgments were entered, subsequent developments have only exacerbated these problems, as multiple other creditors have obtained multi-million dollar judgments against Mr. Veluchamy and/or his wife. Although once again wholly unrelated to the Debtors, the judgments have generated significant negative publicity. Accordingly, even beyond the numerous defaults under their lending facilities, the Debtors have been struggling to hold on to concerned customers, and competitors have been actively taking advantage of the Debtors' plight.

14. Despite the cascade of defaults and negative publicity emanating from the judgments against Mr. and Mrs. Veluchamy, the Debtors have managed to maintain operations

8

for several months. Unfortunately, however, the foregoing issues have resulted in serious concerns about the Debtors' continued ability to operate. This is particularly true given that the Debtors' businesses are seasonal, with the Debtors' greatest volumes of both sales of plastic cards (including retailer gift cards) and shipments of promotional materials arriving in the months leading up to the holidays. Right now, as the Debtors gear up for their busiest season, their cash needs (for example, to purchase raw materials and other inputs and to fund payroll and other costs) are most acute. Any unexpected disruption in operations at this time would be devastating to the Debtors' ability to survive over the long term.

15. The Debtors' concerns about their continued ability to operate during this critical part of the year have been further heightened by the fact that many customers have exhibited insecurity about the Debtors' stability in light of the litigation surrounding the Debtors' principals. This uncertainty has threatened key customer relationships, and competitors have been aggressively waging a negative campaign, suggesting to customers that the Debtors may be unable to service their orders during the critical holiday season. The Debtors vitally need stability and a way to assure customers that the high level of service they have always received from the Debtors will not be disrupted.

## *Appointment of Independent Chief Restructuring Officer*

16. In light of these circumstances, and to best exercise their fiduciary duties, the Debtors retained Dan Scouler and Scouler & Company ("*Scouler*") as an independent Chief Restructuring Officer, and after a thorough review of their options, have initiated the instant bankruptcy proceeding to restructure their debts and maximize value. The Debtors determined that a proactive chapter 11 bankruptcy filing presented the best and most efficient forum for globally resolving their financial issues, restoring the confidence of customers and suppliers, and

9

generally maximizing value for all stakeholders. In connection with that effort, the Debtors are seeking the following "first day" relief.

## First Day Motions

17. I believe that the approval of the Debtors' First Day Motions submitted concurrently herewith is critical and necessary to the success of the Debtors' Chapter 11 Cases. The factual background and support for each of the Debtors' First Day Motions is provided below.[5]

### Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

18. In order to optimally and economically administer the Debtors' pending Chapter 11 Cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to VCT-NJ. Many of the motions, hearings and orders that will arise in the Chapter 11 Cases will jointly affect each and every Debtor. By jointly administering the Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Chapter 11 Cases and ease the onerous administrative burden of having to file multiple and duplicative documents.

19. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

---

[5] Capitalized terms not defined in this section shall have the same meaning ascribed in the respective First Day Motion.

10

**Motion for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition (I) Sales, Use, and Franchise Taxes and (II) Tolls, Fees, Licenses and Other Similar Charges and Assessments and (B) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Presented for Payment Related Thereto**

20.     The Debtors have filed a motion (the "*Tax Motion*") seeking authority to pay, in their sole discretion, certain Taxes and Fees (as defined below) in the ordinary course of business.

21.     In connection with the normal operation of their businesses, the Debtors, as described more fully below, (a) incur sales and use, franchise, and other taxes necessary to operate their businesses (collectively, the "*Taxes*"), and (b) are charged for tolls, fees, licenses, permits, and other similar charges and assessments (collectively, the "*Fees*") by various taxing, tolling, and licensing authorities (collectively, the "*Taxing Authorities*"). The Taxes and Fees are paid to the various Taxing Authorities on a periodic basis and, depending on the nature and incurrence of a particular Tax or Fee, are remitted monthly, quarterly, or yearly. More specifically, the Taxes and Fees incurred by the Debtors fall into one of the following categories:

### Sales Taxes

22.     In the normal course of business, several of the Debtors, including, without limitation, VCT-NJ, VCT, and FXI, are required to collect sales taxes (the "*Sales Taxes*") from non-exempt purchasers of their products (typically credit cards) and periodically remit the Sales Taxes to the applicable Taxing Authorities. Certain of the other Debtors incur Sales Tax obligations relating to customer mailings, which they then bill their customers for. Typically, Sales Taxes accrue as products are sold or mailings are sent out, and such taxes are calculated based on a statutory percentage of the sales price. The process by which the Debtors remit the Sales Taxes varies, depending on the nature of the tax at issue and the Taxing Authority which is

11

to be paid, depending on the method required by the relevant Taxing Authority. Similarly, states differ with respect to the frequency of payments. For example, for jurisdictions that require the Debtors to remit estimated Sales Taxes, the applicable Taxing Authority subsequently reconciles (or audits) payments to determine any payment deficiency or surplus for the period and the applicable refund or payment is then made.

23. As of the Petition Date, the Debtors estimate that approximately $15,000 in Sales Taxes relating to the prepetition period either already have or will become due and owing to the Taxing Authorities in the ordinary course of business. Payment of the Sales Taxes is critical to the continued, uninterrupted operations of the Debtors. Moreover, I believe that nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens on the Debtors' assets, preventing the remaining operating Debtors from conducting business in the applicable jurisdictions, and seeking to lift the automatic stay, all of which would disrupt the Debtors' operations and could potentially impose significant costs on the Debtors' estates.

### Use Taxes

24. In addition to the Sales Taxes, the Debtors are sometimes required to pay other use taxes (collectively, the "*Use Taxes*") in certain limited circumstances. For example, the Debtors can be required to pay Use Taxes when they purchase equipment from vendors who are not always located in the state in which the equipment is to be delivered and the vendor does not collect and remit state sales tax on account of the subject transaction. The Debtors estimate that they owe less than $25,000 in Use Taxes incurred prior to the Petition Date. To the extent the Use Taxes are unpaid, the Debtors' officers and directors may be subject to lawsuits for such nonpayment. Such lawsuits would distract from the Debtors' reorganization efforts and the

12

related costs would far exceed the potential amount of Use Taxes incurred as of the Petition Date.

**Real and Personal Property Taxes**

25. The Debtors own several parcels of real estate in Illinois and New Jersey (the "*Real Properties*") as well as personal property located in several states throughout the country (including, without limitation, Illinois, New Jersey, and Iowa) that are subject to state and local property taxes (the "*Real Property Taxes*" and "*Personal Property Taxes*," respectively, and collectively the "*Property Taxes*"). The Real Property Taxes on the Real Properties – at least \$2 million per year and last paid in March – are generally paid on a semi-annual basis in arrears, such that there is a lag between when the taxes accrue and when they come due. If unpaid, the Real Property Taxes could create liens on the Real Properties. Personal Property Taxes are usually paid on an annual basis. Although the Debtors are unaware of any outstanding personal property transactions, they respectively request authority to pay any amounts that may exist, particularly because as with the Real Property Taxes, certain jurisdictions place a lien for unpaid Personal Property Taxes on the property so taxed. To the extent that liens are placed on properties that exceed the value of the unpaid Property Taxes, the Debtors' Property Tax obligations could be increased by the accumulation of interest, and the Debtors' operations could generally be disrupted by collections efforts instituted by the applicable Taxing Authorities, including the imposition of tax liens on the Debtors' assets.

**Franchise Taxes**

26. The Debtors pay franchise taxes (the "*Franchise Taxes*") to certain Taxing Authorities to operate their businesses in the applicable taxing jurisdiction. States can assess franchise taxes based on a variety of criteria. For example, (a) some states assess a flat Franchise

13

Tax on all businesses, (b) some states assess a Franchise Tax based upon net operating income, and (c) other states assess a Franchise Tax on capital employed in the business. A large portion of the Debtors' Franchise Taxes (approximately $3,000) are related to VCT-NJ's incorporation in Delaware. The Debtors, while they are generally current with respect to the Franchise Taxes, estimate that they may owe approximately $1,500 with respect to the Franchise Taxes incurred prior to the Petition Date. If the Debtors do not pay the Franchise Taxes, the respective Taxing Authorities may suspend the Debtors' right to do business in the respective states, resulting in the shutdown of the Debtors' operations in the respective jurisdictions.

**Tolls**

27.    In the ordinary course of business, certain of the Debtors have drivers who routinely drive trucks or other vehicles on highways which require vehicles to pay tolls (collectively, the "*Tolls*"). Depending upon the situation, a driver may simply pay a Toll in cash and later be reimbursed from the Debtors. In most cases, however, the Tolls may be registered on a state tolling authority-approved electronic transponder (an "*E-Transponder*") whereby tolls are assessed and recorded by the E-Transponder as the applicable vehicle passes through the tollbooth. In addition to shorter waiting periods at tollbooths, the Debtors pay less for respective Tolls where an E-Transponder is used which allows the Debtors to more efficiently and cost-effectively conduct their operations as they minimize labor, fuel, and wear and tear costs. The ability to deliver vehicles on schedule, in turn, results in increased customer goodwill and further business opportunities.

28.    Where E-Transponders are used, the Debtors generally prepay the respective Taxing Authority, with the E-Transponder replenished from a corporate credit card. The Taxing Authorities will then credit such amounts against the incurred Tolls.

14

29.     If the Debtors were to default on the payment of the Tolls, the Taxing Authorities could deactivate the Debtors' E-Transponders. Such an action by the Taxing Authorities would impair the Debtors' ability to operate in such states.

**Business License Fees**

30.     Many municipal and state governments in which the Debtors operate their businesses require the Debtors to obtain a business license and to pay corresponding business license fees (the "*Business License Fees*"). The criteria requiring a company to obtain a business license and the manner that the Business License Fees are computed vary greatly according to local laws. Some jurisdictions assess Business License Fees based on a flat rate and others upon the number of employees working in the jurisdiction. The Debtors estimate that each entity pays less than $2,000 in Business License Fees annually, and that while the Debtors are generally current on their obligations, some of these amounts could be accrued but unpaid. In the event that the Debtors fail to pay the Business License Fees, the respective Taxing Authorities may revoke the Debtors' license in the respective state or municipality. Such an action could suspend the Debtors' right to do business in the respective jurisdiction, thereby effectively forcing the Debtors to close their operations in the jurisdiction. The amount of revenue that could be lost during a short shutdown far outweighs the amount of the Business License Fees that might be owing as of the Petition Date.

**Registration Fees**

31.     The Debtors are required to register and pay annual registration fees (collectively, the "*Registration Fees*") for their corporate vehicles. The nonpayment of certain of the Registration Fees could result in a significant disruption of the Debtors' remaining operations. The Debtors' failure to pay the Registration Fees may lead a base state to revoke the registration

15

credentials of the Debtors' vehicles in such state *as well in all other states* in which the Debtors operate. Since all state laws require an operator of a vehicle to properly obtain registration credentials prior to the operation of such vehicle, without registration credentials, the Debtors would be unable to legally operate the vehicles in effectively all states, potentially resulting in a total disruption of business.

32. The Registration Fees are paid in advance and the Debtors have timely paid their Registration Fees. Therefore, the Debtors believe that they do not owe any prepetition amounts relating to Registration Fees.

33. I believe that the Debtors are substantially current with respect to all of the above-described Taxes and Fees, however it is possible that (i) some Taxes and Fees accrued prepetition were not, in fact, paid prepetition or were paid in an amount that was less than the amount actually owed, or (ii) payments sought to be made prepetition were lost or otherwise not received in full by any of the Taxing Authorities. Further, there may be Taxes and Fees incurred prepetition that may become due shortly after the commencement of the Chapter 11 Cases. I believe that the total accrued but unpaid amount of Taxes and Fees is approximately $1,042,500 – representing a small fraction of the Debtors' total consolidated assets as of the Petition Date.

34. I believe that the failure to pay the Taxes and Fees could trigger a material adverse impact on the Debtors' operations, including the potential suspension of the Debtors' ability to operate in certain jurisdictions. Moreover, if any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful Chapter 11 Cases.

16

35.     Accordingly, I believe that the relief requested in the Tax Motion is in the best

interests of the Debtors' estates, their creditors, and other parties in interest.

**Motion for Entry of an Order Authorizing Debtors to (A) Continue to Use Existing Cash Management System and Bank Accounts, (B) Continue Intercompany Transactions and Provide Administrative Priority Status to Intercompany Claims, and (C) Continue to Use Existing Checks and Business Forms**

36.     The Debtors have filed a motion (the "*Cash Management Motion*") seeking

authorization to continue to use their existing cash management system and bank accounts, to

continue intercompany transactions and provide administrative expense status to intercompany

claims, and to continue to use existing checks and business forms.

37.     The Debtors' Cash Management System consists of 39 bank accounts

(collectively, the "*Bank Accounts*"), each of which is described in the Cash Management Motion

and in the schedule of accounts attached thereto as Exhibit A. The Cash Management System

enables the Debtors to centrally control and monitor corporate funds, ensure cash availability and

liquidity, comply with the requirements of the Debtors' financing agreements, reduce

administrative expenses by facilitating the movement of funds, and enhance the development of

accurate account balance and presentment information.

38.     As detailed on the chart attached as Exhibit A to the Cash Management Motion,

the Debtors' cash receipts and disbursements generally flow as follows:

> *a.*   *Operating Accounts.* The Debtors collectively maintain 18 operating accounts (the "*Operating Accounts*") at 11 different banks for the purpose of receiving payments from customers and paying ordinary course business expenses. Customers' payments are received by the Debtors in the form of automatic clearing house ("*ACH*") receipts, physical checks, or wire transfers, and are then deposited into the appropriate Operating Accounts. Funds in the Operating Accounts are then used to fund ordinary course expenses, including everything from vendor costs to company credit and gas cards. Use of separate Operating Accounts allows the Debtors to segregate funds and easily track receipts and disbursements by entity.

17

*b.*     ***Payroll Accounts.***  Each of the Debtors that have employees (10 total Debtors) maintains a payroll account (collectively, the "*Payroll Accounts*") used to fund their respective payroll. All Payroll Accounts are funded directly from the associated Operating Accounts (money is manually transferred after the weekly payroll numbers have been processed).

*c.*     ***Postage Accounts.***  In the ordinary course of their direct marketing business, the Debtors send out millions of pieces of mail for large corporate clients every day.  Rather than paying the postage costs themselves and then waiting for reimbursement, the Debtors instead require customers to pre-deposit postage costs (thereby reducing risk and minimizing their borrowing and/or cash needs).  To ensure that customer postage deposits are segregated, five of the Debtors (those with significant mailing operations) maintain postage accounts (the "*Postage Accounts*") at six different banks.  Customer deposits are held in the appropriate Postage Accounts until they are used to fund the associated shipping costs.

*d.*     ***USS Publication Account.***  University Subscription Service, Inc. maintains a publication account (the "*USS Publication Account*") at Inland Bank.  This account is used to fund the publication costs associated with the magazine orders for a given week.  Each week, in the ordinary course of business, the amount of money required for the publication of that week's worth of magazines is taken out of the Operating Account for University Subscription Service, Inc. and moved to the USS Publication Account.

*e.*     ***USS Refund Account.***  University Subscription Service, Inc. maintains an account (the "*USS Refund Account*") at Inland Bank.  This account is used to pay refunds to customers in the ordinary course of business.  These refunds are paid when customers have overpaid on their accounts or have cancelled their subscriptions.  Each week, the refunds due are calculated and that amount is taken from the University Subscription Service, Inc. Operating Account and put in the USS Refund Account in order for University Subscription Service, Inc. to issue appropriate refunds to its customers.  The amount due for refunds in any given week varies from around $150 to $500.

*f.*     ***Qualteq Accounts.***  Qualteq, Inc. ("*Qualteq*") is currently in the process of consolidating and reorganizing its bank accounts, as Qualteq recently entered into a loan refinance agreement with Sterling Bank ("*Sterling*"), in which it paid off certain of its prior indebtedness to other institutions. Currently, Qualteq has nine accounts at four different banks (see list in Exhibit A).  Qualteq intends for Sterling to become its primary bank going forward and has very recently opened an Operating/Lockbox Account and an Operating/Disbursement Account at Sterling for this purpose.  After the

18

> transition is fully effectuated, all checks will be received in the Operating/Lockbox account at Sterling, where they will then be processed and the amounts transferred to the Operating/Disbursement Account to be used to be used to cover ordinary operating expenses. Qualteq also intends to open a payroll account at PNC Bank in the near future, which would be funded from the Sterling Operating/Disbursement Account.
>
> Currently, however, Qualteq continues to maintain Disbursement, Payroll, Operating, and Money Market accounts at TD Bank (one of the lenders who was paid off in the Sterling refinancing).[6] Qualteq intends to promptly close down its Disbursement, Payroll, and Money Market accounts at TD Bank, although it intends to keep the Operating Account open for some time while it transitions customers to the new Sterling accounts (to collect any amounts that customers continue to send to TD Bank). Qualteq also has two accounts open at PNC Bank: a Disbursement Account and an Operating/Lockbox Account. Qualteq has kept these accounts open only because some customers still send payments to the PNC Bank lockbox. These customer payments are then processed and deposited in the PNC Bank Operating/Lockbox Account, and eventually transferred over to the main Operating Account (currently at TD Bank, but soon to be at Sterling Bank). Qualteq intends to close these accounts within the next few months as part of its transition to Sterling Bank. Qualteq also currently has one Operating Account at Bank of America that it no longer uses and is in the process of closing.

39.    The Debtors believe that shutting down their Cash Management System only to establish a new, nearly-identical system would involve significant and unnecessary effort and cost (related to opening new accounts, revising cash management procedures, and instructing customers to redirect payments) and potentially cause significant disruptions to their businesses. Preserving the "business as usual" atmosphere and avoiding the unnecessary distractions associated with such a process will facilitate the Debtors' reorganization efforts.

40.    As noted above, the Debtors' Postage Accounts are used to hold customer postage deposits which the Debtors then pass on to the United States Post Office (or other appropriate

---

[6]    The TD Bank Disbursement Account is a zero balance account, but can be used to write checks against the TD Bank Operating Account. Money in the TD Bank Operating Account is swept up into the TD Bank Money Market Account whenever the balance reaches $250,000, so that interest can be earned on the money held.

19

recipients) in the ordinary course of their business. As these customer deposits are not property of the Debtors' estates, the Debtors do not believe that they should need specific authority to continue to use them in the ordinary course, even if the deposits were made prior to the Petition Date. If the Debtors are not able to forward these deposits on, customer mailings could not go out, and the Debtors would risk losing major customers, quite possibly causing irreparable harm to the Debtors' estates.

41.     Prior to the Petition Date, the Debtors engaged in intercompany transactions (collectively, the "*Intercompany Transactions*") in the ordinary course of their respective businesses as part of their Cash Management System, including issuing loans between Debtor entities to effectively deploy cash and grow their businesses.[7] The Debtors routinely track these transactions in the ordinary course of their financial operations and are at all times aware of the balances owed between Debtors. The Debtors respectfully submit that these transfers are necessary to preserve and enhance the value of their estates, and therefore represent an appropriate exercise of their business judgment.

42.     In the ordinary course of their business, the Debtors use a multitude of checks and other business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.). I do not believe that any creditors or parties in interest would be harmed by the continued use of the Debtors' existing check stock or substantially similar new checks.

---

[7]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of the Bankruptcy Code § 363(c)(1) and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

20

43.     Because of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe that it is important that the Debtors be permitted to continue to use their business forms without alteration or change. Indeed, I believe that parties doing business with the Debtors will most likely be aware of the Debtors' status as a debtor in possession as a result of the publicized nature of these Chapter 11 Cases.

44.     In the ordinary course of business, various third-parties, such as payroll and benefits administrators and providers, prepare and issue checks on behalf of the Debtors (the "*Check Writing Privileges*"). I believe that if the Check Writing Privileges are interrupted, it could result in a disruption of the Debtors' operations and a significant erosion of the Debtors' employees' morale.

45.     Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**Motion for Entry of an Order (A) Authorizing but not Requiring the Debtors to Pay Certain Prepetition (I) Wages, Salaries, and Other Compensation, (II) Employee Medical, Insurance, and Similar Benefits, (III) Workers' Compensation Obligations, (IV) Vacation and Similar Benefits, and (V) Reimbursable Employee Expenses, (B) Authorizing but not Requiring the Debtors to Continue to Make Deductions from Employees' Paychecks, and (C) Authorizing and Directing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing**

46.     The Debtors' approximately 1,370 Employees are employed generally as follows: (i) Automated Presort, Inc. employs 247 people (239 hourly and 8 salaried); (ii) Creative Automotion Company employs 184 people (88 hourly and 96 salaried); (iii) Global Card Services, Inc. employs 172 people (165 hourly and 7 salaried); (iv) Qualteq, Inc. employs 165 people (145 hourly and 20 salaried); (v) Unique Embossing Services, Inc. employs 54 people (51 hourly and 3 salaried); (vi) Unique Mailing Services, Inc. employs 193 people (190 hourly and 3

21

salaried); (vii) Unique Data Services, Inc. employs 97 people (62 hourly, 27 hourly who work from home, and 8 salaried); (viii) University Subscription Service, Inc. employs 8 people (5 hourly and 3 salaried); (ix) Versatile Card Technology, Inc. employs 227 people (210 hourly and 17 salaried); and (x) Fulfillment Xcellence, Inc. employs 14 people (all salaried).

47. In the Wage Motion, the Debtors seek authority, in their sole discretion, to pay and honor certain prepetition wage and benefit obligations the ("*Prepetition Wage and Benefit Obligations*"), as well as maintain the postpetition wage and benefit programs described herein (the "*Postpetition Wage and Benefit Programs*"). In addition, the Debtors request the right to modify, change, and discontinue any of the Postpetition Wage and Benefit Programs in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval. The continued utilization of the Postpetition Wage and Benefit Programs constitutes the ordinary course of business.

## Prepetition Employee Obligations

48. The Prepetition Wage and Benefit Obligations remain owing as of the Petition Date. The Debtors seek to pay these obligations to maintain morale at this critical time for the Debtors' businesses and to avert irreparable harm that could occur if the Employees are not paid. The Debtors anticipate that all amounts described as owing herein can be paid by the Debtors with cash generated in the ordinary course of business.

49. As of the Petition Date, the Debtors do not believe that they owe any significant prepetition amounts to their Employees on account of salaries or hourly wages, as most of the Debtors' Employees had been paid through the Petition Date. The only reason that the Debtors may owe some prepetition amounts on account of salaries and hourly wages is that some checks may not have cleared prior to the Petition Date (as a result of Employees failing to timely

22

negotiate them or otherwise). The Debtors estimate that the amount of such checks is less than $100,000 – a relatively *de minimis* amount given that the Debtors on average pay over $2.7 million in salaries and wages each month. I do not believe that the Debtors owe any Employee more than $11,725 in unpaid salaries and wages.

50. Although the Debtors are not seeking to pay any Employee over $11,725 on account of ordinary compensation (salaries, wages, and benefits) owed prior to the Petition Date, certain of the Debtors have commission programs (the "*Commission Programs*") for their sales-related Employees.[8] In many cases, commission payments are made monthly or quarterly (as opposed to weekly or bi-weekly as in the case of salaries and hourly wages). As a result, the Debtors believe that as of the Petition Date, approximately 20 commissioned salespeople are likely owed more than $11,725 on account of accrued but unpaid commissions. The Debtors estimate that the most any Employee is owed in excess of $11,725 is approximately $7,000, and that on average, the amount owed in excess of $11,725 per eligible Employee is approximately $2,000, for a total of $40,000. Given the importance of the Debtors' salespeople to the continued success of the business – especially in a time when the Debtors' competitors will be actively attempting to make inroads into their customer base – the Debtors believe that payment of all prepetition amounts owed to Employees who have earned but not been paid commissions is both necessary and appropriate and in the best interests of the Debtors' estates and creditors.

51. Although direct expense reimbursements are minimized by the use of corporate credit cards (discussed below), from time to time the Debtors do reimburse their Employees for

---

[8] The Debtors who have Employees eligible to receive commissions are CAC, FXI, VCT, GCS, API, and VCT-NJ.

23

reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment. As of the Petition Date, I understand that approximately $20,000 remained outstanding on account of reimbursable expenses that had been incurred by Employees but not yet reimbursed. In addition, there may be reimbursable expenses that have been incurred by Employees that have not yet been submitted for payment. The reimbursable expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.

52.     The Debtors deduct certain amounts from their Employees' paychecks for remittance to taxing authorities. As of the Petition Date, I understand that approximately $200,000 has been withheld from Employees' paychecks but not yet remitted to the appropriate taxing authorities.

53.     The Debtors maintain a retirement savings plan that meets the requirements of section 401(k) of the Internal Revenue Code. As of the Petition Date, I understand that approximately $84,000 has been withheld from participants' paychecks and has been forwarded, but may not have cleared the Debtors' bank accounts yet.

54.     The Debtors provide life insurance and accidental death and dismemberment insurance to eligible Employees through UNUM. As of the Petition Date, I understand that the Debtors owe less than $15,000 on account of the employer portion of these obligations.

55.     The Debtors maintain several corporate programs designed to prevent their Employees from having to seek reimbursement for certain costs associated with their employment. Among these programs is the Fuel Card Program (defined below) which manages

24

the fuel costs for certain of the Debtors' automobiles.[9]  As of the Petition Date, I understand that the Debtors estimate that they owe approximately $11,000 on account the Fuel Card Program.

56.     As noted above, the amount of expense reimbursements processed by the Debtors is generally minimized by the use of corporate credit cards to fund necessary corporate expenses. These cards (collectively, the "*Corporate Cards*"), which certain of the Debtors provide to specific Employees,[10] are used to purchase supplies or otherwise fund expenses in the ordinary course of business. As of the Petition Date, the Debtors estimate that an aggregate balance of less than $200,000 was outstanding on the Corporate Cards.

Postpetition Employee Obligations

*Wage Obligations*

57.     All of the Employees will continue to be paid in the same manner they were prior to the Petition Date and in the ordinary course of the Debtors' businesses.

*Remitting and/or Paying Appropriate Deductions and Withholdings*

58.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' gross pay, including, without limitation: (a) garnishments, child support, and similar deductions; and (b) other pre-tax and after-tax deductions payable pursuant to the Employee benefit plans discussed herein (*e.g.*, contributions relating to health care benefits, insurance premiums, and 401(k) contributions) (collectively, the "*Deductions*").  The Debtors forward such Deductions to various third-party recipients.

---

[9]     The Debtors that provide fuel cards to certain of their employees include, without limitation, UMS, API, CAC, and VCT.

[10]    The Debtors that provide corporate credit cards to certain of their employees include, without limitation, VCT-NJ, API, CAC, FXI, GCS, UDS, UES, UMS, and VCT.

25

59.     In addition to the Deductions, the Debtors are required by law to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "*Withheld Amounts*"). The Debtors are also required to pay additional amounts for Social Security, workers' compensation costs for certain states, and federal and state unemployment insurance (collectively, the "*Employer Payroll Taxes*," and together with the Withheld Amounts, the "*Payroll Taxes*"). Before the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Payroll Taxes, but such funds may not yet have been forwarded to the appropriate taxing authorities.

## Employee Benefits

60.     In the ordinary course of business, the Debtors maintain various Employee benefit plans and policies, including, without limitation, health care plans, dental plans, workers' compensation benefits, accidental death and dismemberment insurance, short term disability insurance, paid time off, and COBRA-mandated benefits (collectively, the "*Employee Benefits*").

### *Medical and Dental Plans*

61.     With the exception of VCT-NJ (discussed below), all Debtors that have Employees offer their Employees a choice of an HMO plan or a PPO medical plan through Blue Cross (together with the VCT-NJ medical plan described below, the "*Medical Plans*"). Participating Employees pay a portion of their health care coverage through a payroll deduction, with the amounts varying by Employee (depending on the coverage chosen and the Employee's family status, for example). The Debtors pay either 50% (for family plans) or 65% (for individual plans) of the cost of the basic HMO plan no matter what plan Employees select. All Employees become eligible to enroll in the medical plans after 90 days of employment.

26

62. The Debtors (again, with the exception of VCT-NJ) also offer Employees a passive PPO dental care plan through Blue Cross (together with the VCT-NJ dental plan described below, the "*Dental Plan*"). Participating Employees pay a portion of their dental coverage through a payroll deduction, with the amounts varying depending on family status. The Debtors pay the remaining costs (approximately $40 per month per Employee).

63. VCT-NJ also offers health and dental coverage to its Employees but its plans are offered through Amerihealth. VCT-NJ covers 60% of the cost of both the medical and dental plans, and Employees are responsible for 40% of the cost. The monthly cost to VCT-NJ of these plans is approximately $28,300 for the medical plan and $2,600 for the dental plan. Employees are also offered supplemental insurance through AFLAC, but that is completely Employee funded.

*Workers' Compensation*

64. The laws of various states in which the Debtors operate require them to maintain workers' compensation insurance policies and programs to provide their Employees with workers' compensation benefits for claims arising from, or related to, their employment with the Debtors. The Debtors – including VCT-NJ – maintain their current workers' compensation coverage through a fully insured, third-party insurance program (the "*Workers' Compensation Policy*") provided by National Fire and Insurance Company of Hartford.

65. The Debtors' Workers Compensation Policy is paid through their broker, Lamb, Little & Co. In connection with the Workers' Compensation Policy, the Debtors made a down payment of approximately $197,000 in the beginning of 2011 and make subsequent monthly payments of approximately $92,000 (which monthly payments will continue until the deposit is applied in lieu of payments at the end of the year).

27

*Paid Time Off*

66.     Although specific policies differ slightly by Debtor, the Debtors generally provide personal time off to Employees to cover holidays, vacation, and illness (the "*Paid Time Off*"). Except to the extent required by law, paid time off benefits neither carry over into the following year nor can they be exchanged for pay or additional compensation.

67.     Employees earn vacation time based on their continuous service with the company that employs them. Depending on the Debtor at issue, Employees are eligible for between five and ten days during the first year of service, with the amount of time increasing to up to 15 days based on years of service. With the exception of VCT-NJ (10 days), all Employees receive six paid holidays per year and between 4 and 6 sick days.

*401(k) Plans*

68.     The Debtors maintain a retirement savings plan for the benefit of all eligible Employees that meet the requirement of section 401(k) of the Internal Revenue Code (the "*401(k) Plan*"). The 401(k) Plan is administered through Transamerica and the Debtors currently do not have any costs associated with administering the 401(k) Plan aside from a *de minimis* management fee. None of the Debtors offer any matching for 401(k) contributions.

*Life, Accident, and Disability Insurance*

69.     Certain of the Debtors provide life insurance (the "*Life Insurance Coverage*") and AD&D Coverage (the "*Disability Benefits*") for their Employees through Anthem Blue Cross. These programs are funded 50% by Employees (via payroll deductions) and 50% by the Debtors.

28

*COBRA Benefits*

70.    At any given time, one or more former employees of the Debtors may have elected to receive COBRA coverage for medical insurance, which can cost as much as $5,000 per month per employee electing to receive such coverage.

*Reimbursable Corporate Expenses*

71.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimbursed Employees for reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "*Reimbursable Expenses*"). These programs are generally described below.

A.    Reimbursable Travel and Business Related Expenses

72.    The Debtors' Employees are entitled to reimbursement of expenses for business travel or in performing work on behalf of the company. Employees are reimbursed for expenses incurred in connection with travel including mileage for use of personal cars, gas/oil, various auto expenses for company cars (including repairs, tire changes, and maintenance), transportation (such as taxi or rental cars while traveling), meal expenses, client entertainment expenses, airfare, and lodging. In addition to travel expenses, Employees are reimbursed for office supplies, phone and fax expenses (including cell phones), and other miscellaneous expenses. The majority of these expenses are incurred by sales staff and members of senior management; however, any and all Employees can incur expenses with the approval of their manager. Many expenses are incurred on the Corporate Cards, but Employees occasionally submit expense reports and their Reimbursable Expenses are paid through the payroll system.

WM1A 1007930v1 08/15/11

B. Corporate Programs

73. The Debtors also maintain a number of corporate programs (the "*Corporate Programs*") that are designed to prevent the Employees from having to seek reimbursement for certain costs associated with their employment.

Vehicle Program

74. The Debtors lease approximately 15 vehicles for their sales Employees, corporate executives, and other Employees who are required to travel as part of their jobs, at an average of $1,200 to $1,300 per vehicle. The Debtors are currently making monthly payments on these leases in the aggregate amount of $18,000 to $19,500 per month.

Cell Phone Program

75. Certain of the Debtors either reimburse specific Employees for cell phone bills or provide specific Employees with company-paid cell phones (occasionally including data access or unlimited minutes as necessary, but typically just phones with a limited number of minutes) to allow them to conduct corporate business remotely (the "*Cell Phone Program*"). For example, CAC reimburses two Employees for their cell phones (one with a data plan, one without), and VCT-NJ provides pre-paid cell phones with limited minutes to approximately 18 Employees, three with data plans. Other Debtors have similar programs, typically for Employees whose role requires significant travel, customer contact outside of the office, or otherwise warrant company-paid cell phone access. The Debtors estimate that they spend approximately $12,000 per month on the Cell Phone Program.

Fuel and Corporate Card Programs

76. In order to efficiently manage fuel costs for the Debtors' automobiles, certain of the Debtors provide fuel cards to their Employees (the "*Fuel Card Program*"). Prior to the

30

Petition Date, the Debtors spent approximately $10,000 on the Fuel Card Program per month. The Debtors have approximately ten fuel cards associated with their automobiles.

77.     As noted above, the amount of expense reimbursements processed by the Debtors is generally minimized by the use of Corporate Cards to fund necessary corporate expenses. The Employees who receive these cards are also liable for the amounts owed, so if the Debtors are not able to pay the amounts owed, it would place a severe hardship on many of the Debtors' key Employees.

78.     The Deductions and the Payroll Taxes principally represent Employee earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees and administrative headaches for the Debtors. Indeed, the Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support payments that are not the Debtors' property, but, rather, have been withheld from Employees' paychecks on such parties' behalf. Moreover, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit such payments.

79.     The vast majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Employees will not receive health coverage and, thus, may become

31

obligated to pay certain health care claims in cases where the Debtors have not paid the respective insurance providers.

80.     In addition, and as described above, the Debtors' directors and officers could potentially be held personally liable for unpaid wages or other Employee obligations and the Debtors thus seek to pay these amounts to avoid any such liability.

81.     For all of the foregoing reasons, the relief requested in the wages motion will benefit the Debtors' estates and creditors by allowing the Debtors to continue to operate their businesses efficiently and effectively without interruption. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities. Such a development would hinder the Debtors' ability to effectively wind-down their operations and result in a costly distraction at a time when the Debtors need to focus on maximizing the value of the estates. Accordingly, the Debtors must be able to pursue all reasonable measures to retain their Employees by, among other things, continuing to honor all wage, benefits, and related obligations.

82.     Accordingly, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

## Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment of Future Utility Services

83.     The Debtors incur expenses for gas, water, waste, electric, telecommunications, and other similar utility services (collectively, the "*Utility Services*") provided by approximately 65 utility providers, and have filed a motion to address adequate assurance issues with respect to providers of the Utility Services (the "*Utility Motion*"). A list of the Utility Providers who rendered services to the Debtors as of the Petition Date is attached as Exhibit A to the Utility

32

Motion. The Debtors' forecasted, postpetition run rate for the Utility Services is anticipated to be approximately $275,000 per month.

84. Uninterrupted utility services are essential for securing the Debtors' various locations and preserving the collateral therein. Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' property and seriously jeopardize the Debtors' ability to conduct an efficient bidding process to sell substantially all of their assets. It, therefore, is critical that utility services continue uninterrupted during these Chapter 11 Cases.

85. The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of their businesses. The Debtors expect that the funding to be obtained through the use of cash collateral and under proposed postpetition financing will be sufficient to pay postpetition obligations related to their Utility Services, as set forth in the cash collateral and proposed financing budgets.

86. Accordingly, I believe that the relief requested in the Utility Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest.

**Debtors' Emergency Motion Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders (1) Authorizing Use of Cash Collateral; (2) Scheduling a Final Hearing; and (3) for Related Relief**

87. The Debtors have filed a motion (the "*Cash Collateral Motion*") seeking entry of interim and final orders authorizing them to use cash collateral that certain of their lenders assert an interest in.

88. Certain entities (collectively, the "*Lenders*") appear to assert security interests in cash or cash proceeds of other assets of the respective Debtors as follows:

| Entity | Debtor(s) |
|---|---|
| Amalgamated Bank of Chicago | FXI |
|  | VCT |
| Burr Ridge Bank and Trust | GCS |

33

| Inland Bank | UMS |
|---|---|
| Oakbrook Financial[11] | CAC |
| | UDS |
| | USS |
| Sterling Bank | VCT-NJ |

89.     The Debtors set forth above (collectively, the "*Cash-Encumbered Debtors*") have an immediate need to use cash collateral (as that term is defined in section 363 of the Bankruptcy Code, the "*Cash Collateral*") of the respective Lenders in order to assure the orderly administration of their bankruptcy estates. Without use of the Lenders' Cash Collateral on a limited basis, I believe that the Cash-Encumbered Debtors will not be able to pay their employees and other direct operating expenses. Inability to use the Cash Collateral on an emergency basis will likely result in an immediate cessation of the ongoing operations of the Cash-Encumbered Debtors' businesses and will cause irreparable harm to the Cash-Encumbered Debtors' estates (not to mention to the estates of the other Debtors since all are part of an integrated direct marketing operation). Put simply, the Cash-Encumbered Debtors cannot continue operations and cannot continue their restructuring efforts absent use of the Cash Collateral. For this reason, I believe that it is critical that the Cash Collateral Motion be presented on an emergency basis.

90.     Based on my review of the most current balance sheets, the assets of the Cash-Encumbered Debtors (other than CAC, UDS, and USS) materially exceed the secured claims of their respective Lenders.

---

[11]     For purposes of disclosure, the Debtors note that Oakbrook Financial is a finance company in which the spouse of one of the Debtors' principals has an interest.

34

91.     I believe that the ability of the Cash-Encumbered Debtors to finance, through the use of Cash Collateral, their ongoing operations as they restructure their indebtedness and businesses for the benefit of all creditor constituencies is in the best interests of the Cash-Encumbered Debtors, all their creditors, and their estates. I also believe that the relief requested herein is necessary in order to avoid immediate and irreparable harm and prejudice to the estates and to all parties in interest in these Chapter 11 Cases.

92.     The Cash-Encumbered Debtors have an urgent and immediate need to use Cash Collateral to continue to their business operations while they pursue the restructuring. I believe that all of the Debtors' businesses will be immediately and irreparably harmed without authorization from the Court to use Cash Collateral, as requested, on an interim basis pending the final hearing, and the Cash-Encumbered Debtors' restructuring efforts (as well as, in all likelihood, the restructuring efforts of all of the Debtors) will be over.

93.     Accordingly, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest.

**Motion for Interim and Final Orders Pursuant to Sections 105, 363, 503, 1107, and 1108 of the Bankruptcy Code (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (B) Setting a Final Hearing on the Motion; and (C) Approving Procedures Related Thereto**

94.     The Debtors seek to have the Court authorize payment of Critical Vendor Claims in an aggregate amount not to exceed $1.9 million (the "*Critical Vendor Cap*") on an interim basis. Although the Debtors hope that this initial amount turns out to be sufficient, given the number of "sole source" and customized vendors that the Debtors have, I understand that the Debtors believe this figure is quite conservative. The Debtors thus seek authority to reserve the right to seek an increase in the Critical Vendor Cap.

35

95.     The Critical Vendors supply the Debtors with goods and services that are vital to the operation of the Debtors' direct marketing and plastic card businesses. Much of the Debtors' revenues come from large commercial clients, such as major national banks and other well-known national retailers. Regardless of whether the Debtors are issuing plastic cards for such customers (such as credit cards, gift cards, or club cards) or sending out time-sensitive promotional mailings, world-class service and responsiveness are absolutely essential. Any unexpected delays could result in the loss of substantial business to the Debtors' competitors (many of whom have already been aggressively waging a negative campaign to take advantage of the Debtors' plight), and any such loss of business would be devastating – and potentially fatal – to the Debtors' businesses at this time.

96.     The Critical Vendors provide goods and services that are absolutely critical to the Debtors' continued ability to operate. The Debtors believe that the failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide critical services to the Debtors postpetition. Any interruption in the flow of goods and services provided by the Critical Vendors would have an immediately devastating effect on the Debtors' ability to provide services to their customers which would, in turn, cripple the Debtors' reputation in a very competitive market. Moreover, with respect to each of the Critical Vendors, changing to another vendor to obtain replacement goods and services would either be impossible (many are sole-source providers) or would result in months of delay (many of the Critical Vendors provide goods or services that are customized to the Debtors and would take any other provider months – and significant costs – to duplicate). Any delay – let alone a multi-month delay – would immediately and severely impact the Debtors' daily operations and their ability to service and keep key customers.

36

97.     I understand that the Debtors and their advisors have thoroughly examined whether, based on the Debtors' experience and business judgment: (i) key vendors are likely to cease providing goods or services if they are not paid; and (ii) the loss of such goods or services would significantly harm the Debtors' business operations and/or cause irreparable injury to vital customer relationships. The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that the Debtors derive maximum value for payments to Critical Vendors, including that the Critical Vendors will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis.

98.     In determining an estimate of the Critical Vendor Claims, I understand that the Debtors consulted with the appropriate members of their management team to identify those vendors that are most essential to the Debtors' operations, using the following criteria: (a) whether the vendor in question is a "sole-source" or "limited source" provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in significantly higher costs to the Debtors; and (c) the overall impact on the Debtors' operations if the particular Critical Vendor ceased provision of goods or services. I understand the Critical Vendors and payments of certain of their claims are absolutely necessary for the Debtors to continue to operate in chapter 11.

99.     Accordingly, I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest.

37

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

By: _____

Name: Arun Veluchamy
Vice President of Qualteq, Inc., d/b/a VCT New Jersey, Inc., and
authorized signatory of the Debtors