## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| QUALTEQ, INC., | ) | |
| d/b/a VCT NEW JERSEY, INC., *et al.*, | ) | Case No. 11-12572 (KJC) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Objection Deadline: September 29, 2011 at 4:00 p.m.** |
| | ) | **Hearing Date: October 6, 2011 at 3:30 p.m.** |

## MOTION OF BANK OF AMERICA, N.A. TO TRANSFER VENUE OF THESE CASES TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

Bank of America, N.A. ("Bank of America"), pursuant to 28 U.S.C. §§ 1404, 1406, and 1412 and Federal Rule of Bankruptcy Procedure 1014, respectfully moves the Court for the entry of an order transferring venue of the bankruptcy cases filed by Qualteq, Inc., d/b/a VCT New Jersey, Inc. ("Qualteq") and its sixteen purportedly affiliated debtors and debtors in possession (collectively, with Qualteq, the "Debtors") to the U.S. Bankruptcy Court for the Northern District of Illinois.[1] In support of this motion, Bank of America states as follows:

## I.     PRELIMINARY STATEMENT AND SUMMARY

1.     The Debtors are a group of family businesses that are owned and controlled by Pethinaidu Veluchamy ("Mr. Veluchamy"), Parameswari Veluchamy ("Mrs. Veluchamy") (collectively, the "Veluchamys"), and their adult children, Arun Veluchamy ("Arun") and Anu

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Qualteq, Inc., d/b/a VCT New Jersey, Inc. (4600); (ii) 1400 Center Circle, LLC (7091); (iii) 5200 Thatcher, LLC (6991); (iv) 5300 Katherine, LLC (6016); (v) Automated Presort, Inc. (0850); (vi) Avadamma LLC (4775; 4800; 4810; 4829); (vii) Creative Automation Company (4350); (viii) Creative Investments, a General Partnership (5992); (ix) Fulfillment Xcellence, Inc. (3461); (x) Global Card Services, Inc. (4581); (xi) Unique Data Services, Inc. (1068); (xii) Unique Embossing Services, Inc. (1043); (xiii) Unique Mailing Services, Inc. (2594); (xiv) University Subscription Service, Inc. (3669); (xv) Versatile Card Technology, Inc. (5258); (xvi) Veluchamy LLC (3434); and (xvii) Vmark, Inc. (5904).

EAST\46743083.1

Veluchamy ("Anu"), all of whom reside in Illinois. The elder Veluchamys filed a Chapter 7 case in the Northern District of Illinois the day after the Debtors' Chapter 11 filings in Delaware. Sixteen of the seventeen Debtors are Illinois entities, are headquartered in Illinois, operate and conduct business in Illinois, and employ over 1,250 people in Illinois. Most of the Debtors' creditors are also in or around Illinois. Further, Illinois is the venue in which litigation was filed by Bank of America—resulting in judgments against the Veluchamys in excess of $43 million—that plainly led the Debtors and the Veluchamys to seek bankruptcy relief.

2.      The Debtors nonetheless filed all seventeen of their Chapter 11 cases in the U.S. Bankruptcy Court for the District of Delaware. The connection to Delaware is slight. Venue in Delaware is based on the seventeenth Debtor, Qualteq, a second-tier subsidiary of Debtor VMark, Inc. (an Illinois corporation), being incorporated in Delaware. But Qualteq's operations are in New Jersey and, like the sixteen other Debtors, Qualteq is ultimately managed by the Veluchamys and Arun in Illinois. Under the totality of these circumstances, the convenience of the parties and the interest of justice each overwhelmingly warrant the prompt transfer of all of these Chapter 11 cases to the U.S. Bankruptcy Court for the Northern District of Illinois, where the Veluchamys' individual bankruptcy case already is proceeding.

## II.      PROCEDURAL AND JURISDICTIONAL BACKGROUND

3.      On August 15, 2011, the Debtors filed voluntary petitions seeking relief under Chapter 11 of the Bankruptcy Code in this Court. The Debtors are in possession of their assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. An official committee of unsecured creditors has been appointed in this case.

4.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Except as

discussed later with respect to three of the Debtors (see *infra* at ¶ 31 n.5), venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory bases for the relief requested in this motion are 28 U.S.C. §§ 1404, 1406, and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure.

6.     As set forth in greater detail below, Bank of America is a party-in-interest and creditor in these Chapter 11 cases by virtue of final and non-appealable judgments in excess of $43 million against (and accompanying judgment liens in and to the property of) the Veluchamys. Specifically, the Veluchamys have concealed, hidden, or purported to transfer their assets—including their direct and indirect equity interests in the Debtors and other assets that Bank of America believes can be traced into the Debtors—in an effort to hinder, defraud, or delay Bank of America as it attempts to collect on its judgments.

### III.     FACTUAL BACKGROUND

**A.     The Debtors**[2]

7.     The Debtors collectively employ approximately 1,370 people at nine domestic facilities—seven in Illinois, one in Iowa, and one in New Jersey. (Arun Decl. ¶¶ 5-6, 8.) The vast majority of these employees—over 1,250 of them—work in Illinois. (Ex. A at 2, Preliminary Response to Turnover Motion.) Arun has previously testified in Bank of America's post-judgment collection proceedings against the Veluchamys in the Northern District of Illinois that as President of Debtor VMark, Inc., he is "the boss of everyone for all of these companies." (Ex. B at 9, 5/25/11 Arun Dep.) Mrs. Veluchamy, Arun, and Anu are currently the directors for each

---

[2] For purposes of this motion, Bank of America restates the Debtors' representations in their bankruptcy filings. By citing these representations, however, Bank of America is not vouching for their accuracy, and reserves all rights to rely on any contrary evidence in the future.

Debtor. (Voluntary Petitions, Resolutions of Board of Directors.) The Veluchamys, Arun, and Anu all reside in the Chicago area and within the Northern District of Illinois.

8.       Of the 17 Debtors, only one has any apparent connection to Delaware. Qualteq is a Delaware corporation, but operates a facility in New Jersey. (Arun Decl. ¶ 6.) Qualteq employs 165 people—approximately 12% of the Debtors' workforce. (*Id.* ¶¶ 6, 8, 46.) Mrs. Veluchamy handles Qualteq's finances from Illinois. (Ex. C at 331, 4/27/11 Mrs. Veluchamy Dep.) And Arun, who resides in Illinois, is "the boss of everyone" at Qualteq. *Supra* ¶ 7.

9.       The remaining 16 Debtors are all Illinois entities, are headquartered in Illinois, and operate in Illinois (one also operates a second facility in Iowa):

    a.     Versatile Card Technology, Inc. ("VCT") is an Illinois corporation and operates from a facility located in Illinois. (Arun Decl. ¶ 6.) VCT owns all of Qualteq (Qualteq Corp. Ownership Stmt.), and is itself wholly owned by VMark, Inc. (VCT Corp. Ownership Stmt.), an Illinois corporation.

    b.     VMark, Inc., in addition to being an Illinois corporation, is based in Illinois. (Arun Decl. ¶ 6; VMark Voluntary Petition at 1.) Mrs. Veluchamy presently owns 19.8% of VMark's voting stock; Arun and Anu each own 40.1%. (VMark Corp. Ownership Stmt.)[3]

    c.     Global Card Services, Inc. ("GCS") is an Illinois corporation and operates from a facility located in Illinois. (Arun Decl. ¶ 6.) GCS is wholly owned by VMark. (GCS Corp. Ownership Stmt.)

    d.     Unique Embossing Services, Inc. ("UES") is an Illinois corporation and operates from a facility located in Illinois. (Arun Decl. ¶ 6.) UES is wholly owned by VMark. (UES Corp. Ownership Stmt.)

    e.     Unique Data Services, Inc. ("UDS") is an Illinois corporation and operates from a facility located in Illinois. (Arun Decl. ¶ 6.) UDS is wholly owned by VMark. (UDS Corp. Ownership Stmt.)

    f.     Creative Automation Company ("CAC") is an Illinois corporation and operates from a facility located in Illinois. (Arun Decl. ¶ 6.) CAC is wholly owned by VMark. (CAC Corp. Ownership Stmt.)

---

[3] The transfer of ownership shares of various Debtors from the Veluchamys to their children is the subject of fraudulent transfer claims in Bank of America's Illinois litigation.

g.  Automated Presort, Inc. ("API") is an Illinois corporation, is based in Illinois, and operates from facilities located in Illinois and Iowa. (Arun Decl. ¶ 6; API Voluntary Petition at 1.) API is wholly owned by VMark. (API Corp. Ownership Stmt.)

h.  Fulfillment Xcellence, Inc. ("FXI") is an Illinois corporation and is based in Illinois. (Arun Decl. ¶ 6, FXI Voluntary Petition at 1.) FXI is wholly owned by VMark. (FXI Corp. Ownership Stmt.)

i.  Unique Mailing Services, Inc. ("UMS") is an Illinois corporation and operates from a facility located in Illinois. (Arun Decl. ¶ 6.) Arun and Anu each presently own 40.816% of UMS's stock; Mr. Veluchamy owns 5.102%; Mrs. Veluchamy owns 13.26%. (UMS Corp. Ownership Stmt.)

j.  University Subscription Services, Inc. ("USS") is an Illinois corporation and is based in Illinois. (Arun Decl. ¶ 6; USS Voluntary Petition at 1.) Mrs. Veluchamy presently owns 70% of USS's stock; Arun and Anu each own 15%. (USS Corp. Ownership Stmt.)

k.  Veluchamy, LLC is an Illinois limited liability company and is based in Illinois. (Arun Decl. ¶ 6; Veluchamy, LLC Voluntary Petition at 1.) Mrs. Veluchamy presently owns 75% of Veluchamy, LLC; Arun and Anu each own 12.5%. (Veluchamy, LLC List of Equity Security Holders.)

l.  Creative Investments, GP ("CIGP") is an Illinois general partnership, is based in Illinois, and owns the Illinois property where CAC is headquartered. (Arun Decl. ¶ 6; CIGP Voluntary Petition at 1.) Mrs. Veluchamy presently owns 80% of CIGP; Arun and Anu each own 10%. (CIGP List of Equity Security Holders.)

m.  1400 Center Circle, LLC is an Illinois limited liability company, is based in Illinois, and owns the Illinois property where API is headquartered. (Arun Decl. ¶ 6; 1400 Center Circle, LLC Voluntary Petition at 1.) Arun and Anu each presently own 50% of 1400 Center Circle, LLC. (1400 Center Circle, LLC List of Equity Security Holders.)

n.  5200 Thatcher, LLC is an Illinois limited liability company, is based in Illinois, and owns the Illinois property where VCT is headquartered. (Arun Decl. ¶ 6; 5200 Thatcher, LLC Voluntary Petition at 1.) Arun and Anu each presently own 50% of 5200 Thatcher, LLC. (5200 Thatcher, LLC List of Equity Security Holders.)

o.  5300 Katrine, LLC is an Illinois limited liability company, is based in Illinois, and owns the Illinois property where UDS is headquartered. (Arun Decl. ¶ 6; 5300 Katrine, LLC Voluntary Petition at 1.) Arun and

Anu each presently own 50% of 5300 Katrine, LLC. (5300 Katrine, LLC List of Equity Security Holders.)

    p.    Avadamma, LLC is an Illinois limited liability company, is based in Illinois, and owns the Illinois property where GCS, UES, and USS are headquartered. (Arun Decl. ¶ 6; Avadamma, LLC Voluntary Petition at 1.) Arun and Anu each presently own 22.45% of Avadamma, LLC, Mr. Veluchamy owns 5.1%, Mrs. Veluchamy owns 1%, and the remaining 49% is owned by the Veluchamy 2009 Dynasty Trust. (Avadamma, LLC List of Equity Security Holders.)

## B.   Creditors

10.    The creditors of the Debtors are likewise heavily concentrated in or around Illinois. In contrast, hardly any creditors are located in Delaware.

11.    The Debtors filed a Consolidated List of Creditors Holding 30 Largest Unsecured Claims. (Dkt. #1.) None of the creditors holding those claims are located in Delaware. Instead:

    a.    42.86% of the creditors (and 28.93% of the total amount owed on those claims) are located in Illinois.

    b.    10.71% of the creditors (and 17.83% of the total amount owed) are located in Wisconsin, Iowa, and Missouri, states adjacent to Illinois.

    c.    21.43% of the creditors (and 13.92% of the total amount owed) are located in Michigan, Texas, Ohio, and California, states closer to Illinois than to Delaware.

    d.    14.29% of the creditors (and 30.76% of the total amount owed) are located in foreign countries and are not significantly closer to Illinois or Delaware.

    e.    Only 10.71% of the creditors (and 8.56% of the total amount owed) are located in states closer to Delaware than to Illinois—North Carolina, Maryland, and New Jersey.

12.    The Debtors also filed an Amended Creditor Matrix which lists a total of 5,258 creditors. (Dkt. #53.) Of those creditors, 2,394 are identified as located in Illinois, 45.53% of the total. Only 10 are identified as located in Delaware, 0.19% of the total.

**C.   Bank of America's Judgments and Citation Proceedings**

13.    The Debtors' filing of these Chapter 11 bankruptcy cases plainly was a response to Bank of America's claims against the Veluchamys, Arun, Anu, and the Debtors, which have been heavily litigated in Illinois and were on the verge of being resolved (a one-week trial on a motion to turnover assets and appoint a receiver in collection proceedings was to begin on August 22, 2011) when the Debtors filed their voluntary petitions. It is clear that these Debtors and their representatives have shopped for a forum far away from the Illinois courts in their attempt to reframe the facts and circumstances leading up to their bankruptcy filings and escape the burden of their prior misconduct, judicial admissions, and judicial estoppel.

14.    Between 2005 and 2008, the Veluchamys borrowed $29 million from Bank of America's predecessor, LaSalle Bank (based in Chicago, Illinois), that the Veluchamys did not repay. In addition, Mr. Veluchamy personally guaranteed an additional $10 million loan made by LaSalle Bank to First Mutual Bancorp, a bank holding company owned by the Veluchamy family; that loan also was not repaid. The Veluchamys initially defaulted on their loans on November 30, 2008, subsequently entered into forbearance agreements extending the due dates, and defaulted again when the forbearance agreements came due on June 30, 2009. The loan and forbearance agreements state that they are governed by Illinois law and that any disputes involving the agreements must be litigated in Chicago, Illinois. (*See, e.g.,* 12/1/05 Loan Agreement §§ 9.16 ("This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois."), 9.17 ("To induce Lender to accept this Agreement and the other Loan Documents, Borrowers irrevocably agree that all actions or proceedings in any way, manner, or respect, arising out of or from or related to this Agreement or the other Loan Documents shall be litigated only in courts having suits within Chicago, Illinois.") (Ex. D)).

15.     In August 2009, Bank of America sued the Veluchamys in the U.S. District Court for the Northern District of Illinois ("Illinois District Court"). *See Bank of America N.A. v. First Mutual Bancorp et al.*, Case No. 2009-CV-5108; *Bank of America, N.A. v. Pethinaidu Veluchamy et al.*, Case No. 2009-CV-5109. On December 30, 2010, the Illinois District Court entered judgments against the Veluchamys on all of the loans and the guaranty, totaling more than $43 million, including interest. With accruing interest and out-of-pocket expenses, these judgments now total in excess of $46 million. These judgments are final and non-appealable.

16.     In January 2011, Bank of America commenced supplemental proceedings in the Illinois District Court to collect the judgments by serving Citations to Discover Assets on the Veluchamys, and later on Arun and Anu, all of the Debtors here except for Qualteq, and various other parties. Under Federal Rule of Civil Procedure 69(a)(1)-(2), the procedure for discovering and collecting assets of a judgment debtor is governed by state law. The Illinois citation statute, 735 ILCS 5/2-1402, in turn, "gives the court broad powers to compel the application of discovered assets or income in order to satisfy a judgment," *Dexia Credit v. Rogan*, 629 F.3d 612, 624 (7th Cir. 2010), including assets held by third parties. *Id.* at 622-24 (affirming an order compelling a trust for the debtor's children to turn over assets that the debtor fraudulently transferred into the trust); *Star Ins. v. Risk Mktg.*, 561 F.3d 656, 662 (7th Cir. 2009) (holding that when "third parties h[o]ld assets of the . . . judgment debtors," the court may "order a third party to deliver up those assets to satisfy the judgment"). In the course of the supplemental proceedings in the Illinois District Court, Bank of America deposed company-designated representatives (Mr. Veluchamy and Arun) for seven of the Debtors.

17.     In order to obtain the loans and forbearance agreements, the Veluchamys had provided financial statements showing that they owned substantial assets far in excess of their

debts to Bank of America. Yet Bank of America soon discovered in the course of the supplemental collection proceedings that after defaulting on the loans and guaranty, the Veluchamys engaged in a truly breathtaking scheme to hide and fraudulently transfer their substantial assets. The Illinois District Court was troubled as well, remarking at one point that "although I have not made any ultimate holdings, the evidentiary proceedings that have taken place since I inherited the case have strongly suggested that the Veluchamys' family members may perhaps be . . . the most pervasively corrupt litigants that I have been exposed to in something more than three decades that I have been on the bench." 8/17/11 Hearing Tr. at 8 (Ex. E); *see also* 7/20/11 Hearing Tr. at 21 (characterizing the Veluchamys' financial dealings "as a shell game that creates the sort of vanishing asset kind of business that gets in the way of the orderly collection of a legitimate judgment") (Ex. F). Indeed, the Illinois District Court twice referred matters that arose in the citation proceedings to the U.S. Attorney's Office for potential criminal prosecution. The U.S. Attorney's Office's criminal investigation is ongoing.

18.    The Veluchamys' shell game to hide their substantial assets leads directly to their family businesses, the Debtors here. Specifically, after defaulting on Bank of America's loans, the Veluchamys transferred millions of dollars to bank accounts in India, and then transferred the money to Arun's and Anu's bank accounts in India, who in turn used the funds (supposedly transformed into Arun's and Anu's money) to either acquire most of the Veluchamys' interests in the Debtors or to provide direct support to the Debtors.

19.    For example, from September 2009 through September 2010, the Veluchamys transferred $18.6 million to Arun's and Anu's bank accounts in India, purportedly pursuant to a

series of so-called "indemnity agreements."[4] Arun and Anu claim that pursuant to these agreements, their parents agreed to reimburse them for their investments in a Veluchamy-owned bank if that bank were to fail (as it ultimately did). But the Veluchamys retained control over the indemnity proceeds. The purported indemnity agreements include a "restriction that the indemnified funds shall be returned for use as capital or loans for the benefit of the business known as Vmark Inc., an Illinois corporation, and its affiliates" (the Debtors). (*See, e.g.,* Ex. G.) The purported indemnity agreements also state that they were "delivered to [Arun and Anu] and accepted by [them] in the State of Illinois" and "are governed by and construed in accordance with the laws of the State of Illinois." *Id.* ¶ 6.

20.  On July 18, 2011, Bank of America filed in the Illinois District Court a Motion for Preliminary and Permanent Injunction, Appointment of a Receiver, and Turnover of Assets Belonging to the Judgment Debtors ("Turnover Motion"). The Turnover Motion sought relief under Illinois law, including the Illinois citation statute, 735 ILCS 5/2-1402, and the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* The Turnover Motion asserted that the indemnity payments to Arun and Anu were fraudulent transfers and that the payments or any proceeds from the payments should be turned over to satisfy Bank of America's judgments. It also asserted that the Veluchamys' direct and indirect equity interests in the Debtors have been hidden or concealed pursuant to their purported transfer to Arun and Anu, and that certain of the Veluchamys' assets can be traced into the Debtors and thus should be turned over and applied to

---

[4] There is substantial evidence that the "indemnity agreements" are nothing more than phony backdated documents that were generated by the Veluchamys well after the fact to provide some cover for transferring away funds. The Illinois District Court has already agreed that "the so-called indemnity arrangements . . . on their face have some suspicious aspects. And I am choosing my language very carefully." 7/20/11 Hearing Tr. at 43 (Ex. F).

Bank of America's judgments. The Turnover Motion further requested that the Illinois District Court appoint a receiver to take possession of the Debtors and their assets.

21.     The Illinois District Court set the Turnover Motion for a one-week evidentiary hearing beginning on August 22, 2011. On August 8, 2011, the Illinois District Court held a pretrial conference. The parties subsequently exchanged witness and exhibit lists, and the Veluchamys took the deposition of Bank of America's principal expert opinion witness.

**D.     The Veluchamys And Their Family Businesses File For Bankruptcy Relief**

22.     But on August 15, 2011, one week before the hearing, the Debtors filed these cases for bankruptcy relief under Chapter 11 in the District of Delaware. The next day, the Veluchamys filed for bankruptcy relief under Chapter 7 in the Northern District of Illinois. In light of the automatic stays, the Illinois District Court cancelled the August 22 hearing.

23.     Remarkably, in describing the "Events Leading to These Chapter 11 Cases" in their bankruptcy court filings, including a sworn declaration from Arun, the Debtors say nothing about Bank of America, the Illinois District Court proceedings, or the impending August 22 hearing on the Turnover Motion that threatened to place the Debtors into receivership and/or require the Debtors to turn over assets to satisfy Bank of America's judgments.

24.     Instead, the Debtors claim that their "problems first arose" in December 2010 when Vasu and Jaganath Naidu and Rajiv Parthasarathy obtained more than $2 million in judgments against Mr. Veluchamy. (Arun Decl. ¶ 12.) The Debtors claim that based on these judgments against Mr. Veluchamy, "millions of dollars in loans [to the Debtors] from numerous lenders . . . were suddenly in default." *Id.* The Debtors then say that "*[a]lthough the damage was already done,*" "subsequent developments have only exacerbated these problems, as multiple

other creditors have obtained multi-million dollar judgments against Mr. Veluchamy and/or his wife" that are "wholly unrelated to the Debtors." *Id.* ¶ 13 (emphasis added).

25. This story is complete fiction. Shortly after Bank of America commenced its supplemental proceedings in the Illinois District Court, Vasu and Jaganath Naidu and Rajiv Parthasarathy moved to intervene, claiming they had obtained two judgments against Mr. Veluchamy in Cook County (Illinois) Circuit Court on December 2 and 3, 2010, in cases first filed on December 1, 2010. They claimed that their judgment liens predated, and therefore had priority over, Bank of America's December 30, 2010 judgments.

26. The intervenors argued that Bank of America was not entitled to pursue any discovery about the circumstances leading to their one-day, agreed judgments. The Illinois District Court rejected that argument and allowed discovery to proceed.

27. The intervenors initially were less than candid about their relationship with the Veluchamys, but the discovery soon revealed that the intervenors actually are Mrs. Veluchamy's sister, brother-in-law, and nephew. The discovery further disclosed that the one-day, agreed judgments were the result of a collusive scheme to funnel assets to relatives, with Mr. Veluchamy controlling virtually every aspect of the cases that purportedly were against him. The intervenors admitted that Mr. Veluchamy chose and paid for their lawyers, that Mr. Veluchamy and his lawyers reviewed the intervenors' retention agreements with their lawyers, that the purported loans underlying the judgments were based on backdated promissory notes created by Mr. Veluchamy, that the promissory notes were inaccurate in nearly every material respect (including the loan amount), and that much of the money that the intervenors supposedly loaned to Mr. Veluchamy actually originated with Mr. Veluchamy himself. (Ex. H at 24-27, 7th

Cir. Brief.) In short, the Illinois state court cases that the Veluchamy-owned Debtors now claim caused their problems were orchestrated from start to finish by Mr. Veluchamy himself.

28.    Indeed, the collusive judgments were so problematic that the Illinois District Court on its own initiative took the unusual and telling step of notifying the U.S. Attorney's Office in Chicago of potential criminal activity. 4/1/11 Hearing Tr. at 2-3 ("I think part of my responsibility is to inquire of the United States Attorney's Office whether they would review this thing to determine whether what is assertedly involved here represents a fraud on the Court that could serve as a grist for their mill. It is absolutely not my judgment in that respect, but in the civil sense I found what is tendered here very troubling.") (Ex. I).

29.    Although the Debtors now claim that these collusive judgments against Mr. Veluchamy left the Debtors "suddenly in default" on their own loans and that "the damage was already done" when these judgments were entered in December 2010, that is not what they told the Illinois District Court in July 2011, only weeks before they filed these bankruptcy cases. In response to Bank of America's Turnover Motion, which sought to appoint a receiver for the Debtors, several of the Debtors represented to the Illinois District Court that "[t]he appointment of a receiver constitutes an event of default under numerous loans which the Vmark Companies have with multiple third party financial institutions. ... The Vmark Companies are concerned that should a receiver be appointed, many, if not all, of their secured lenders will immediately call their loans." (Ex. A at 6, Preliminary Response to Turnover Motion.) The Debtors certainly never suggested to the Illinois District Court that they were *already* in default on their loans or that "the damage was already done" back in December 2010 due to these one-day, agreed judgments that relatives received against Mr. Veluchamy for $2.7 million. To the contrary, the Debtors represented to the Illinois District Court that "[t]he VMark companies have experienced

increased sales and profitability each year since 2008 and are on pace to substantially increase their sales and profitability in 2011. It is estimated that sales in the first half of 2011 are 50% higher than sales over the same time period in 2010." *Id.* at 6 & n.6.

## IV.   RELIEF REQUESTED

30.    By this motion, Bank of America respectfully requests that this Court enter an order, substantially in the form attached hereto, (a) transferring venue of the 17 bankruptcy cases filed by the Debtors to the U.S. Bankruptcy Court for the Northern District of Illinois and (b) granting such further and other relief as may be appropriate and just.

## V.   BASIS FOR RELIEF REQUESTED

31.    "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. *See also* Fed. R. Bankr. P. 1014(a) ("If a petition is filed in the proper district, the court … may transfer the case to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties. … If a petition is filed in an improper district, the court … may dismiss the case or transfer it to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties.").[5]

---

[5] It appears that the cases of three of the Debtors—USS, CIGP, and Veluchamy LLC—may not have been properly filed in Delaware, which would require the transfer of those cases. *See Thompson v. Greenwood*, 507 F.3d 416, 417-23 (6th Cir. 2007). A bankruptcy case may be commenced in a district "(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States" of the debtor are located, or "(2) in which there is pending a case … concerning such person's affiliate, general partner, or partnership." 28 U.S.C. § 1408. The Debtors filed their cases here because one of them, Qualteq, is incorporated (and therefore domiciled) in Delaware, and the remaining sixteen are purportedly affiliated with Qualteq. But USS, CIGP, and Veluchamy LLC are not technically "affiliates" of Qualteq as defined by 11 U.S.C. § 101(2), as no person or entity owns or controls at least 20% of both Qualteq and USS, CIGP, or Veluchamy LLC. Arun and Anu each own and control 40.1% of Qualteq (through their ownership of VMark, Inc., Qualteq's ultimate parent), but each only owns 15% of USS, 10% of CIGP, and 12.5% of Veluchamy LLC. Similarly, while Mrs. Veluchamy

32.     To assess whether transfer of a bankruptcy case is warranted "in the interest of justice or for the convenience of the parties," courts primarily consider:

    (a)    proximity of creditors of every kind to the court;

    (b)    proximity of the debtor;

    (c)    proximity of witnesses who are necessary to the administration of the estate;

    (d)    the location of the debtor's assets;

    (e)    the economic administration of the estate; and

    (f)    the necessity for ancillary administration in the event of liquidation.

*In re Innovative Commc'n Co.*, 358 B.R. 120, 126 (Bankr. D. Del. 2006); *see also In re B.L. McCandless LP*, 417 B.R. 80, 82-83 (Bankr. N.D. Ill. 2009); *In re Dunmore Homes, Inc.*, 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008); *In re Malden Mills Indus., Inc.*, 361 B.R. 1, 9-10 (Bankr. D. Mass. 2007); *In re B.L. of Miami, Inc.*, 294 B.R. 325, 329 (Bankr. D. Nev. 2003).

33.     Based on these factors, courts in Delaware and elsewhere have routinely granted transfer motions where the debtor and its bankruptcy case had few ties to the district. In *In re Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 306 (Bankr. D. Del. 1988), the court transferred bankruptcy cases from Delaware to Florida because "the majority of creditors in number [and] amount … are Florida claimants and the locale of all assets is Florida," the debtors were already parties to litigation in Florida, and additional litigation would likely arise involving Florida witnesses and Florida law. In *Innovative Communication*, 358 B.R. at 127, the court transferred bankruptcy cases from Delaware to the Virgin Islands because the corporate debtors' principal places of business, creditors, employees, shareholders, operating subsidiaries, and

---

owns 70% of USS, 80% of CIGP, and 75% of Veluchamy LLC, she only owns and controls 19.8% of Qualteq (through her ownership of VMark, Inc.). *Supra* ¶ 9(a), (b), (j), (k) & (l).

assets were in the Virgin Islands. *See also B.L. McCandless LP*, 417 B.R. at 83-84 (transferring case from Illinois to Pennsylvania because all secured creditors, three of four unsecured creditors, and all of the debtor's assets were in Pennsylvania, witnesses were in Pennsylvania, and the case would require application of Pennsylvania law); *In re Dodart Properties, LLC*, 2009 WL 3202403, *1-2 (D. Utah Sept. 30, 2009) (transferring case from Utah to California, even though the debtor's sole owner lived in Utah and made major decisions in Utah, because all of the debtor's assets were in California and over 90% of the creditors were in California); *In re Old Delmar Corp.*, 45 B.R. 883, 884-85 (S.D.N.Y. 1985) (transferring case from New York to Texas primarily because "all of debtors' assets are located in Texas" and "nineteen of the twenty-one creditors are in Texas"); *In re Weber*, 118 B.R. 441, 444 (Bankr. E.D. Va. 1999) (transferring case from Virginia to New York because debtor's only contact in Virginia was an interest in a Virginia limited partnership while "[s]ubstantially all of the debtor's assets, his residence, attorney, accountant and books and records are located in New York" and "New York law will inevitably play a large role in the administration of the estate").

34.    In a typical case, the debtor's venue selection is given deference. However, these cases are not the typical case and thus the mere fact that a corporate debtor is incorporated in the district is not a compelling factor for retaining venue. In *Innovative Communication*, 358 B.R. at 127-28, the court explained that "the place of incorporation [in Delaware] is not the controlling factor and venue in the [Virgin Islands] for the corporate [d]ebtors is strongly indicated." Similarly, in *Ocean Properties of Delaware*, 95 B.R. at 305, the court transferred bankruptcy cases to Florida even though "Debtors are Delaware corporations [and] venue in this District is [otherwise] proper under 28 U.S.C. § 1408." *See also Malden Mills*, 361 B.R. at 10 (transferring cases from Delaware to Massachusetts because "[o]ther than the [d]ebtor being incorporated [in

Delaware] and the presumed 'stalking horse' bidder . . . wanting the case filed there, there is no other apparent connection to Delaware"); *Dunmore Homes*, 380 B.R. at 667, 669 (transferring case from New York to California because the debtor's "only presence in New York [was] its recent incorporation in this state," while most of its creditors, assets, employees, and pending litigation were in California); *B.L. of Miami*, 294 B.R. at 328, 330, 334 (transferring case from Nevada to Florida even though the debtor was incorporated in Nevada because "[w]hile venue [was] technically proper [because the debtor was a Nevada corporation], retention of the case [was] not . . . in the best interest of justice" and not in the convenience of the parties).

    35.    Here, the *only* apparent connection that the Debtors and their bankruptcy cases have to Delaware is that *one of the seventeen* Debtors is a Delaware corporation—far less than even in *Innovative Communication* and *Ocean Properties of Delaware,* where Delaware courts transferred bankruptcy cases to other districts even though *all* of the corporate debtors in those cases were Delaware corporations. Qualteq is a second-tier subsidiary of Debtor VMark, Inc. (itself an Illinois corporation), and although incorporated in Delaware, operates a facility in New Jersey that employs 165 people—only about 12% of the Debtors' workforce. As President of VMark, Arun manages the VMark companies and is the ultimate "boss" at Qualteq. Mrs. Veluchamy handles Qualteq's finances. Both Arun and Mrs. Veluchamy reside in Illinois.

    36.    The remaining *sixteen* Debtors are all Illinois entities, are all headquartered in Illinois, operate seven facilities in Illinois (API also operates a second facility in Iowa), and employ over 1,250 people in Illinois. Thus, the vast majority of the Debtors, their assets, and their employees are located in Illinois. The Debtors are also managed from Illinois, as the Veluchamys, Arun, and Anu all live in Illinois, within the Northern District.

37.     Not surprisingly given the location of the Debtors, most of their creditors are also in or around Illinois, and are certainly closer to Illinois than to Delaware. According to the Debtors, of their creditors holding the largest thirty unsecured claims, *none are in Delaware*, while 42.86% are in Illinois (accounting for 28.93% of the dollar amount owed for those claims). Another 10.71% are in adjacent Wisconsin, Iowa, and Missouri (accounting for 17.83% of the dollar amount). Moreover, another 21.43% are located in states closer to Illinois than to Delaware (accounting for 13.92% of the dollar amount). Only 10.71% of the creditors holding the largest thirty unsecured creditors are located in states closer to Delaware than to Illinois (accounting for 8.56% of the dollar amount). The Amended Creditor Matrix recently filed by the Debtors reveals only a tiny connection to Delaware. Of the 5,258 listed creditors, 2,394 are identified as located in Illinois, 45.53% of the total. Only 10 are identified as located in Delaware, 0.19% of the total. This factor weighs heavily in favor of transfer. *See, e.g., Malden Mills*, 361 B.R. at 10 ("Of the 30 largest unsecured creditors, none are located in Delaware."); *Old Delmar*, 45 B.R. at 885 ("Since nineteen of the twenty-one creditors are in Texas, Texas would be the logical place for them to participate."); *Dodart Props.*, 2009 WL 3202403, *1 ("All of the Debtor's creditors reside outside of Utah, with over 90% located in California.").

38.     The remaining factors—economic administration of the estates, the proximity of witnesses who are necessary to the administration of the estates, and the necessity for ancillary administration in the event of liquidation—also strongly favor an Illinois venue. The Debtors are heavily centered in Illinois, where 16 of the 17 of the Debtors are headquartered, where they own and operate seven facilities employing more than 1,250 people (at least 88% of the Debtors' employees), and where the Veluchamys, Arun, and Anu all reside. Most creditors are also in or around Illinois, including various lenders listed by the Debtors in their filings.

39.     Illinois is also the location of other legal proceedings that are closely tied to the Debtors and the administration of their estates, including (1) the Chapter 7 cases filed by the Veluchamys in the Northern District of Illinois, (2) the supplemental proceedings previously initiated by Bank of America in the Northern District of Illinois to collect over $43 million in judgments that led the Debtors to seek relief under Chapter 11, (3) the $2.7 million one-day, agreed judgments obtained by the Naidus and Mr. Parthasarathy against Mr. Veluchamy in Illinois state court that the Debtors remarkably claim caused the problems that led to their bankruptcy filings, and (4) the ongoing criminal investigation by the U.S. Attorney's Office into those collusive state court judgments and other misconduct arising in the supplemental proceedings. Because of the substantial overlap between the Veluchamys' individual bankruptcies and the Debtors' bankruptcies, it would be far more efficient to have one court deal with them together. That can only occur in Illinois; the Veluchamys' bankruptcies could not be filed in Delaware. Moreover, after telling one story to the Illinois District Court (that the Debtors are profitable businesses but the appointment of a receiver would cause a default on various loans), the Debtors should not be permitted to run to a Delaware court telling an entirely different story (that the "damage was done" and the Debtors were in default on various loans when the one-day, agreed judgments against Mr. Veluchamy were entered).[6]

40.     The Court also has discretion to consider various other private and public interest factors that arise in venue transfer motions under 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, the district court may transfer any civil action

---

[6] Although K&L Gates has now withdrawn, K&L Gates's lead counsel for the Debtors—an Illinois lawyer—has left the firm and has filed an application for the Debtors to employ and retain his new firm, Goldstein & McClintock LLC, as lead counsel for the Debtors. (Dkt. #96.) In addition, the Debtors are represented by other experienced Illinois bankruptcy counsel in the Illinois District Court. Accordingly, the Debtors will be ably represented should the cases be transferred to the Northern District of Illinois.

to any other district or division where it might have been brought."). In *Innovative Communication*, 358 B.R. at 126-27, the court explained that while these factors are weighed in deciding motions under 28 U.S.C. § 1404(a), they are also "relevant" to bankruptcy venue transfer motions under 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014(a).

41.     There is "no definitive formula or list of factors to consider" under 28 U.S.C. § 1404(a). *Innovative Communication*, 358 B.R. at 127 (quoting *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995)). But "the private interests have included: plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (quoting *Jumara*, internal citations omitted). The "public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (quoting *Jumara*, internal citations omitted).

42.     These private and public interest factors address many of the same considerations as the six factors discussed above, and point equally strongly to an Illinois venue. Of the factors not already addressed, to the extent these bankruptcy cases "arose" anywhere, the Debtors and Bank of America all agree that the Chapter 11 filings were driven by Illinois litigation—either

the $2.7 million one-day, agreed judgments in Illinois state court, as erroneously suggested by the Debtors, or Bank of America's $43 million judgments in the Illinois District Court.

43.     If these bankruptcy cases remain in Delaware, there is also a significant risk that key witnesses, many of whom are located in Illinois, would be unavailable for any trial in Delaware. Although employees of the Debtors could presumably be compelled to appear and testify in Delaware, non-company witnesses or former employees would be outside the subpoena power of a Delaware court. *See, e.g., In re Tribune Co.*, 418 B.R. 116, 128 & n.15 (Bankr. D. Del. 2009) (citing *In re U.S. Wireless Corp.*, 2004 WL 1146098, *2 (Bankr. D. Del. May 18, 2004), where "[c]onsideration that key witnesses were located in California, which was beyond the Delaware Court's subpoena power, was one factor in deciding to transfer venue under 28 U.S.C. § 1412"). There is no corresponding risk if the cases are transferred to Illinois, as there is no indication from the extensive discovery already conducted in Illinois and from the Debtors' bankruptcy filings that any potential witnesses reside in Delaware.

44.     Illinois is also likely to supply the applicable state law for many of the claims in any litigation involving the Debtors. For example, the loan and forbearance agreements underlying Bank of America's judgments against the Veluchamys are governed by Illinois law, and further require that any disputes arising out of the agreements be litigated in Chicago, Illinois. Moreover, the "indemnity agreements" that are a key part of Bank of America's dispute with the Veluchamys—and through which the Veluchamys funneled millions of dollars, through Arun and Anu, to the Debtors—specify that they were entered into in Illinois and are governed by Illinois law. Bank of America's fraudulent transfer claims, which directly implicate the Debtors' assets, are likewise governed by Illinois law. This is yet another factor weighing in favor of transfer. *See, e.g., Weber*, 118 B.R. at 444 (transferring case to New York and noting,

among other factors, that "New York law will inevitably play a large role in the administration of the estate. Potential fraudulent conveyance litigation would require New York counsel and the application of New York law"); *Ocean Props. of Delaware*, 95 B.R. at 306 ("It would be more economical to administer the estate in Florida. The greater portion of applicable non-bankruptcy law is that of Florida."); *B.L. McCandless LP*, 417 B.R. at 85 ("It would be much more efficient for the parties if a Pennsylvania judge resolved this issue. This is not to say that this court in unable to interpret questions of Pennsylvania law, only that it is likely that those issues would be more efficiently decided by a Pennsylvania court.").

*[Remainder of page intentionally left blank.]*

## VI.  CONCLUSION

WHEREFORE, Bank of America respectfully requests that the Court enter an order transferring venue of the 17 bankruptcy cases filed by the Debtors to the U.S. Bankruptcy Court for the Northern District of Illinois.

Dated: September 2, 2011
Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ R. Craig Martin
Stuart M. Brown (DE Bar I.D. 4050)
R. Craig Martin (DE Bar I.D. 5032)
919 North Market Street
15th Floor
Wilmington, DE 19801-3046
Phone: (302) 468-5700
Fax: (302) 394-2341
stuart.brown@dlapiper.com
michelle.marino@dlapiper.com

– and –

Thomas S. Kiriakos, Esq. (admission *pro hac vice* pending)
Howard J. Roin, Esq. (admission *pro hac vice* pending)
Joshua M. Grenard, Esq. (admission *pro hac vice* pending)
William R. Stone, Esq. (admission *pro hac vice* pending)
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*Counsel to Bank of America, N.A.*