# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>QUALTEQ, INC., d/b/a VCT NEW JERSEY, INC., *et al.*,<br><br>                           Debtors. | Chapter 11<br><br>Case No. 11-12572 (KJC)<br><br>Jointly Administered |

## MOTION OF JET LITHOCOLOR, INC. FOR RECONSIDERATION OF THIRD INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL IN WHICH STERLING BANK ASSERTS AN INTEREST

Jet LithoColor, Inc. ("**JET**"), by and through its undersigned counsel, hereby files this Motion for Reconsideration of the Third Interim Order Authorizing Use of Cash Collateral in Which Sterling Bank Asserts an Interest entered on October 6, 2011 [Docket No. 270] (the "**Third Interim Cash Collateral Order**") and in support hereof respectfully states as follows:

### Background

**I. JET's License Agreement With Debtor Qualteq, Inc.**

1. On May 1, 2009, JET and Debtor Qualteq, Inc. d/b/a VCT New Jersey. ("**Qualteq**") entered into a License Agreement[1] pursuant to which JET and Qualteq agreed to enter into a pooling arrangement under which they would share in the income derived from licensing of JET and Qualteq patents and share the expenses of licensing and enforcing those patents.

2. Specifically, pursuant to Sections 6 and 8 of the License Agreement, JET and Qualteq agreed that while all technology and all related intellectual property rights owned or developed by a party, including its employees and agents, shall remain the exclusive property of such party, they would cooperate in an effort to license the Licensed Patents to others, and to share in the income and expenses occasioned by those licenses (the "**Licensing Program**").

---

[1] A true and correct copy of the License Agreement is attached hereto as Exhibit "A."

3. Section 10 of License Agreement sets forth the requirements regarding the division of royalties between the parties under the Licensing Program. See License Agreement at § 10. Specifically, for certain prior licenses (i.e., those in existence prior to a 2004 License Agreement between JET and Qualteq) identified in Schedule A to the License Agreement, the parties agreed to divide royalties based upon payment of 80% of the net royalties to Qualteq and 20% of the net royalties to JET. With respect to license agreements executed after January 1, 2004, the parties agreed to divide royalties based upon payment of 60% of the net royalties to Qualteq and 40% of the net royalties to JET. Id. at ¶ 10(a)(i)-(ii).

4. The royalties are required to be paid as collected, not when deemed to be due and owing from an licensee. Id. at ¶ 10(a). In addition, Qualteq is required to maintain "proper records and books of account … showing sales upon which the royalty payments of QUALTEQ and JET are based, and all other information necessary for the accurate determination of payment made [under the License Agreement]." Id. at ¶ 10(e).

## II. The Interim Cash Collateral Orders

5. On August 14, 2011, the above-captioned debtors and debtors-in-possession (collectively, the **"Debtors"**) filed their Emergency Motion Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders (1) Authorizing Use of Cash Collateral; (2) Scheduling Final Hearing; and (3) for Related Relief [Docket No. 7].

6. On August 18, 2011, the Court entered the Interim Order Authorizing Use of Cash Collateral in Which Sterling Bank Asserts an Interest and Scheduling Final Hearing [Docket No. 48] (the **"First Interim Cash Collateral Order"**). Pursuant to the First Interim Cash Collateral Order, Debtor Qualteq was authorized to use cash collateral in accordance with the budget attached thereto as Exhibit A-1. Counsel for JET and counsel for the Debtors

subsequently engaged in negotiations relating to the Debtors' use of cash collateral and royalty payments to JET under the License Agreement.

7. On September 6, 2011, the Court entered the Second Interim Order Authorizing Use of Cash Collateral in Which Sterling Bank Asserts an Interest and Scheduling Final Hearing [Docket No. 132] (the **"Second Interim Cash Collateral Order"**). Exhibit A-1 to the Second Interim Cash Collateral Order includes a line item for "Royalty Payments" in the amount of $73,678, which amount relates to royalties owed to JET. The Second Interim Cash Collateral Order scheduled a final hearing on October 6, 2011.

8. Subsequent to the entry of the Second Interim Cash Collateral Order, counsel for JET and counsel for the Debtors continued to engage in discussions regarding the Debtors' use of cash collateral and the budget attached to the Second Interim Cash Collateral Order as well as a proposed budget to be attached to a proposed further interim order. Based upon these discussions, the Debtors granted JET an extension of time to object to the proposed third interim cash collateral order. The budget presented by the Debtors included a line item in the amount of $65,000 for "Royalty Payments", which amount related solely to royalties payable to JET under the License Agreement, and which JET did not dispute, notwithstanding the reduction from $73,678 reflected in the budget attached to the Second Interim Cash Collateral Order.

9. Counsel for the Debtors and counsel for JET were able to successfully negotiate an agreement with respect to the third interim cash collateral order shortly prior to JET's objection deadline. During these negotiations, on September 26, 2011, September 28, 2011, and October 4, 2011 (just two days prior to the scheduled October 6, 2011 hearing) counsel for the Debtors provided counsel for JET with the budget to be attached to the (then proposed) Third Interim Cash Collateral Order. Each of these budgets included the $65,000 line item previously

agreed between the parties. Counsel for the Debtors advised JET that the $65,000 sum would be paid to JET pursuant to the terms of the Cash Collateral Order, and in fact, the agreed proposed order at that time reflected that such amounts shall be paid to JET.

10. Notwithstanding the agreement referenced above, the day before the October 6, 2011 hearing, counsel for the Debtors communicated to counsel for JET that additional changes had been made to the proposed Third Interim Cash Collateral Order, including the deletion of previously agreed language requiring the Debtors to pay the budgeted $65,000 in "Royalty Payments" to JET.

11. In the minutes leading up to the October 6, 2011 hearing, undersigned counsel for JET was able to negotiate the inclusion of additional language in the Third Interim Cash Collateral Order, which language is interlineated on page 3 thereof.[2] Specifically, the Third Interim Cash Collateral Order requires the Debtors to "hold in escrow any royalty payments to be made to Jet Litho under the Licensing Agreement pending payment of such amounts as set forth in the Budget." Third Interim Cash Collateral Order at p. 3, footnote 3.

12. The Third Interim Cash Collateral Order further states that "absent payment of such [royalty payments] by the Debtors in accordance with the Budget, [the Debtors] shall continue to hold such funds in escrow pending further order of the Court or agreement otherwise between the Debtors, Jet Litho, and the Committee." Id.

13. On the evening of October 6, 2011, after the interim cash collateral hearing and immediately after docketing of the Third Interim Cash Collateral Order, counsel for JET reviewed the docketed Third Interim Cash Collateral Order and saw that a brand new and different budget had been attached thereto. This new budget changed the "Royalty Payment" line item from $65,000 to $13,000. Counsel for the Debtors never advised JET that this change

---

[2] A true and correct copy of the Third Interim Cash Collateral Order is attached hereto as Exhibit "B."

was being made. That same evening, counsel for JET contacted counsel for the Debtors, who indicated that he was investigating the discrepancy and was willing to amend the budget as necessary. See October 7, 2011 E-mail from Matthew McClintock to Dennis A. Meloro attached hereto as Exhibit "C."

14. Not until October 17, 2011, did counsel for the Debtors finally communicate to counsel for JET that this change in the budget was, in fact, intentionally made. Counsel for the Debtors indicated that the "Royalty Payment" budget line item had been changed from $65,000 to $13,000, pursuant to the Debtors' revised calculations, and reflects postpetition royalty amounts payable to JET in the budget period covered by the Third Interim Cash Collateral Order. At no time prior to the docketing of the Third Interim Cash Collateral Order, including at the October 6, 2011 hearing thereon, or necessarily, during the negotiations leading up to the October 6, 2011 hearing, was JET made aware of the change in the budget attached thereto to reduce the line item from $65,000 to $13,000. Indeed, counsel for the Debtors has communicated to counsel for JET that he was not even aware of the change until October 17, 2011 or thereabout.

15. Further, counsel for the Debtors now indicate that they do not believe that the Debtors have to escrow the $52,000 (the $65,000 previously budgeted less the $13,000 currently reflected in the budget) in royalties allegedly collected prepetition pursuant to the pooling arrangement, despite the prior agreement and understanding of the parties that such an escrow would be created to adequately protect JET until such time as its interest in the funds was paid or otherwise mutually established.

## **Relief Requested and Basis Therefor**

16. Federal Rule of Civil Procedure 59(e), made applicable to this proceeding

pursuant to Bankruptcy Rule 9023, permits a party to file a motion to alter or amend a judgment. Fed. R. Civ. P. 59(e).[3] A bankruptcy court has wide latitude to reconsider and vacate its own prior decisions. Bialac v. Harsh Inv. Corp. (In re Bialac), 694 F.2d 625, 627 (9th Cir. 1982). The Court should grant a motion to reconsider when the moving party shows one of the following: "(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice" (citations omitted). North River Ins. Co. v. Cigna Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

17. As set forth above, unbeknownst to JET, the budget attached to the Third Interim Cash Collateral Order (as entered by this Court) was changed from the budget previously provided to JET on at least three occasions prior to the October 6, 2011 hearing. The interlineated language included in the Third Interim Cash Collateral Order was premised upon the parties' prior agreements that the budgeted line item for "Royalty Payments" to JET was $65,000, both (i) immediately prior to and during the October 6, 2011 hearing and (ii) in the roughly ten day period prior to the October 6, 2011 hearing, based upon the budgets sent to counsel for JET on three separate occasions on September 26, 2011, September 28, 2011, and October 4, 2011.

18. As a result of these agreements, JET did not object to the Third Interim Cash Collateral Order on or before its extended October 4, 2011 deadline. Further, at the October 6, 2011 hearing, no mention was made of the reduction in this line item to $13,000, JET was not

---

[3] JET alternatively files this Motion to Reconsider pursuant to Federal Rule of Civil Procedure 60(b), made applicable to this proceeding by Bankruptcy Rule 9024. Rule 60(b) provides, in pertinent part, that relief may be granted from a judgment or order as a result of mistake, inadvertence, surprise, or excusable neglect. FED. R. CIV. P. 60(b).

shown this amended budget, nor was JET otherwise informed that any change had been made thereto.

19. Absent the prior agreement on the terms of the Third Interim Cash Collateral Order and budget attached thereto, as later superseded by the interlineated language in the Third Interim Cash Collateral Order, JET would have objected to Third Interim Cash Collateral Order and budget attached thereto, asserting that the royalty payments due JET under the pooling agreement were not property of the Debtors' estates, and that the JET's interests in such funds were required to be adequately protected..

20. Specifically, JET has a direct interest in the royalties collected and held by Qualteq under the pooling arrangement arising from the parties agreement to share the income and expenses occasioned by the licenses referenced in the Licensing Agreement, including licenses associated with the claims of Patent Nos. 6,491,782 and 6,924,026 owned by JET. The Bankruptcy Code defines cash collateral as "cash … or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest…" 11 U.S.C. § 363(a). Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of cash collateral <u>unless</u> (i) each entity that has an interest in such cash collateral consents or (ii) the Court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of section 363 of the Bankruptcy Code. 11 U.S.C. § 363(c)(2).

21. Pursuant to Sections 6 and 8 of the License Agreement, JET and Qualteq agreed that all technology and all related intellectual property rights owned or developed by a party shall remain the exclusive property of such party, and the parties would share in the income and expenses occasioned by those licenses. The royalty proceeds arising from these licenses and created and allocated under the pooling agreement are JET's property, not subject to the interests

of Qualteq or its creditors except as provided in the pooling agreement.  Such proceeds represent royalty payments due JET, which funds are not property of Qualteq's bankruptcy estate.

22. JET does not consent to, and <u>did not consent to</u>: (i) the use of any royalties and/or other monies properly payable to JET by the Debtors during these chapter 11 cases, except in strict accordance with the terms of the License Agreement; (ii) the Debtors' proposed granting of senior security interests and/or liens on any funds traceable to Qualteq's sale of foil transaction cards pursuant to JET's patents, absent adequate protection thereof; or (iii) entry of any order which allows the Debtors to use royalties generated under the Licensing Agreement, absent a provision in that order which directs that any funds traceable to Qualteq's sale of foil transaction cards, allocated to JET pursuant to the License Agreement which pooled outstanding JET and Qualteq patents, be escrowed into any bank account maintained at Sterling.

23. The handwritten language added to the Third Interim Cash Collateral Order clearly reflects this fact, i.e. the Debtors were required to hold the royalty payments to be made to JET in escrow pending payment pursuant to the budget, absent agreement otherwise or entry of a Court order directing otherwise.  Absent agreement to hold the full $65,000 previously budgeted and agreed in escrow, JET would not have consented to entry of the Third Interim Cash Collateral Order.

## **Conclusion**

WHEREFORE, JET respectfully requests that the Court (i) reconsider the entry of the Third Interim Cash Collateral Order for the reasons set forth herein; (ii) permit JET to present its objections thereto; and (iii) grant such other and further relief as is just and proper.

DEL 86386954v3 October 20, 2011

8

| | |
|---|---|
| Dated: October 20, 2011 | GREENBERG TRAURIG, LLP<br><br>/s/ Dennis A. Meloro<br>Scott D. Cousins (Bar No. 3079)<br>Dennis A. Meloro (Bar No. 4435)<br>The Nemours Building<br>1007 North Orange Street, Suite 1200<br>Wilmington, DE 19801<br>(302) 661-7000<br>Facsimile: (302) 661-7360<br>cousinss@gtlaw.com<br>melorod@gtlaw.com<br><br>and<br><br>Matthew T. Gensburg<br>Jeffrey G. Mote<br>Greenberg Traurig, LLP<br>77 West Wacker Drive<br>Suite 3100<br>Chicago, IL 60601<br>(312) 456-8400<br>Fax: (312) 456-8435<br><br>Attorneys for Jet LithoColor, Inc. |