# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| QUALTEQ, INC., | ) | |
| d/b/a VCT NEW JERSEY, INC., *et al.*,[1] | ) | Case No. 11-12572 (KJC) |
| | ) | |
| Debtor. | ) | Jointly Administered |
| | ) | **RELATED D.I. No. 328** |

## OBJECTION OF BANK OF AMERICA, N.A. TO THE MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ORDER AUTHORIZING SECURED POSTPETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364

Bank of America, N.A. ("Bank of America"), a party-in-interest and contingent creditor in the above-captioned Chapter 11 cases of the Debtors (these "Chapter 11 Cases"), hereby respectfully submits its objection (this "Objection") to the Motion of Debtors and Debtors in Possession for Order Authorizing Secured Postpetition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364 [D.I. #328] (the "DIP Motion"). In support of this Objection, Bank of America states as follows:

## PRELIMINARY STATEMENT

1. On October 19, 2011, the Debtors filed the DIP Motion which requests, among other things, that this Court approve the Debtors' entry into a senior secured superpriority loan facility in the amount of $4,500,000 with Sterling National Bank ("Sterling"), a prepetition lender to the Debtors under a materially similar lending facility (the "DIP Financing"). Notably, of the purported $4,500,000 to be lent to the Debtors under the DIP Financing, approximately

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Qualteq, Inc., d/b/a VCT New Jersey, Inc. (4600); (ii) 1400 Centre Circle LLC (7091); (iii) 5200 Thatcher LLC (6991); (iv) 5300 Katrine LLC (6016); (v) Automated Presort, Inc. (0850); (vi) Avadamma LLC (4775; 4810; 4829); (vii) Creative Automation Company (4350); (viii) Creative Investments, a General Partnership (5992); (ix) Fulfillment Xcellence, Inc. (3461); (x) Global Card Services, Inc. (4581); (xi) Unique Data Services, Inc. (1068); (xii) Unique Embossing Services, Inc. (1043); (xii) Unique Mailing Services, Inc. (2594); (xiv) University Subscription Service, Inc. (3669); (xv) Versatile Card Technology, Inc. (5258); (xvi) Veluchamy LLC (3434); (xvii) Vmark, Inc. (5904); and (xviii) ANAR Real Estate (9267).

700671163 09290775

$3,714,962.83 (i.e., 83%) will be "rolled up" to pay certain prepetition obligations incurred by the Debtors to Sterling in the two weeks preceding the Petition Date.

2. As discussed in further detail below, Bank of America has standing to raise this objection both as a party-in-interest under Section 1109(b) and as a contingent creditor of the Qualteq estate.

3. While Bank of America recognizes that "roll up" debtor in possession financing is entirely appropriate under certain circumstances and lending terms, this is not such a case. Particularly, the Debtors will not realize any substantial benefit from the proposed DIP Financing after the "roll up" is complete, as even the Debtors themselves admit that the revolver portion of the DIP Financing that would remain available to the Debtors (which, as discussed below is not a dime more than was available to them under the parties prepetition loan facility) would be "close to the borrowing limit." See DIP Motion, ¶ 19.

4. Putting aside that this is not a situation in which a "roll up" of the Debtors' prepetition indebtedness to Sterling is appropriate, the Debtors have not attempted to make any showing whatsoever (and could not make any showing) that the proposed terms of the DIP Financing are warranted or appropriate under Section 364(c) of the Bankruptcy Code, nor have they even attempted to comply with Section 364(c)'s requirements for this Court to approve such postpetition financing.

5. Rather, given the facts underlying the Debtors' requested DIP Financing, it appears that the Debtors' motivations for granting Sterling the additional protections and benefits proposed in the DIP Motion clearly demonstrate that the Debtors' request is entirely lacking in actual business judgment. Instead, as explained below, the Debtors' proposed DIP Financing appears to be motivated by nothing more than the Debtors' desire to protect the potential personal liability of their principals, Arun Veluchamy ("Arun") and Anu Veluchamy ("Anu") (as

2

well as certain of their family members) by eliminating their personal liability to Sterling based upon individual guarantees and pledges.

## ARGUMENT

### A. Bank of America Has Standing to Raise This Objection as a Party-In-Interest and Contingent Creditor of Qualteq.

6. Bank of America is a party-in-interest in these Chapter 11 Cases by virtue of final and non-appealable judgments in excess of $43 million against (and accompanying judgment liens in and to the property of) Pethinaidu and Parameswami Veluchamy (the "Veluchamys"). After obtaining its judgments against the Veluchamys in the U.S. District Court for the Northern District of Illinois (the "Illinois District Court"), Bank of America commenced supplemental proceedings to collect the judgments by serving Citations to Discover Assets on the Veluchamys, and later on their children Arun and Anu, as well as the majority of the Debtors in these Chapter 11 Cases. In the post-judgment proceedings conducted in the Illinois District Court, Bank of America discovered that the Veluchamys had engaged in a domestic and international scheme to hide and fraudulently transfer their substantial assets in order to put them out of Bank of America's reach. Particularly, the Veluchamys' shell game to hide their assets leads directly to their family businesses, who are the Debtors in these Chapter 11 Cases. Particularly, after defaulting on their loans to Bank of America, the Veluchamys' transferred millions of dollars to bank accounts in India, and then transferred these funds to Arun and Anu's bank accounts in India, who in turn used these funds (supposedly now transformed into Arun and Anu's money) to acquire most the Veluchamys' interests in the Debtors.

7. As discussed above, Bank of America has identified numerous instances in which the Veluchamys had fraudulently transferred and/or facilitated the purchase of substantial direct and indirect ownership interests in the Debtors, in which Bank of America asserts a perfected

3

security interest. Accordingly, as the proceedings in (and ultimate outcome of) these Chapter 11 Cases have a direct and material effect on the value and disposition of these equity interests, Bank of America is clearly a party-in-interest under Section 1109(b) of the Bankruptcy Code as its pecuniary interests are undoubtedly affected by these Chapter 11 Cases, including with respect to the potential impact of the proposed DIP Financing. See In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985) ("[s]ection 1109(b) must be construed broadly to permit parties affected by a chapter 11 proceeding to appear and be heard" and "[s]ection 1109(b) continues the pattern of permitting interested parties in bankruptcy cases the absolute right to be heard and to insure their fair representation."); In re Global Industrial Technologies, Inc., 645 F.3d 201, 210 (3d Cir. 2011) (stating that "[s]ection 1109(b) 'has been construed to create a broad right of participation in Chapter 11 cases" and that a party in interest is "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding" or "has a sufficient stake in the proceeding so as to require representation."); see also id. at 212 (holding that to satisfy party in interest terms, the question is simply whether the potential party in interest holds any legally protected interest that could be affected by a particular proceeding).

8. Moreover, Bank of America is not only a party-in-interest under Section 1109(b) with standing to make this objection, it is also a contingent creditor of Qualteq, having received certain payments from Qualteq during the 90-day period prior to the Petition Date. Although Bank of America does not believe that these payments are subject to avoidance under Chapter 5 of the Bankruptcy Code, because Bank of America obviously has not received any release or other confirmation from the Debtors that it will not attempt to avoid these payments, it is a contingent creditor of Qualteq with standing to raise this objection. See Slone v. M2M Int'l, Inc. (In re G-P Plastics, Inc.), 320 B.R. 861, 865-66 (E.D. Mich. 2005) (despite creditor receiving payment in full of debt prior to filing of bankruptcy petition, because payment was received

4

within 90 days prior to filing, creditor nevertheless remained a creditor of the debtor holding an unliquidated, unmatured and contingent claim for reimbursement from the debtor because the payment could potentially be avoided under Section 547(b) and "[t]he word 'creditor' has been interpreted to include those entities with unmatured or contingent claims.'").

**B.  The Proposed DIP Financing Fails to Meet Even the Most Basic Requirements of Section 364(c)**

9.  As a threshold matter, the Debtors have made absolutely no attempt to meet even the most basic requirement to obtain postpetition financing under Section 364(c)—that they were unable to obtain credit on less intrusive terms from alternative sources. See 11 U.S.C. § 364(c); see also In re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("A court, however, may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under section 364(a) or (b)."). Moreover, given the numerous and substantial intercompany loans made between the Debtors throughout their existence and the availability of immediate funds from affiliated entities, it is nearly impossible to believe that alternative sources of funding with substantially less onerous terms are unavailable. See In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D.Pa. 1991) ("credit should not be approved when it is sought for the primary benefit of a party other than the debtor or when funds are readily available from insiders or others without providing the lender with the benefits of any priority."). In fact, based on their Initial Monthly Operating Reports filed with this Court, the Debtors' own papers reveal not only that Qualteq, Inc. will continue to maintain a positive net ending cash balances throughout the near future, but that numerous of its affiliated companies will realize continued increases in readily available cash funds, such that it is evident that alternative insider sources of credit are readily available. See Initial Monthly Operating Reports [D.I. #224].

5

10. Strangely, not only have the Debtors failed to show that they have been unable to obtain credit upon more favorable terms, they have failed to demonstrate any need for additional financing or any material benefit otherwise from this proposed DIP Financing.  Particularly, on July 29, 2011 (i.e., 17 days before the Petition Date), the Debtors had entered into a $2,000,000 term loan and a $2,500,000 revolving facility with Sterling, of which they had drawn down in excess of $3.7 million within two weeks.  Accordingly, as of the Petition Date, the Debtors had less than $800,000 of borrowing ability under their existing loan agreement.  As a result of the DIP facility, with its proposed "roll up", the Debtors will have granted additional security and priority to Sterling for the ability to borrow less than $800,000 on what will remain of their available revolver under the DIP Financing.

11. Although not directly disclosed in the DIP Motion (but plainly evident in the prepetition loan agreement and the Assumption Agreement attached thereto), the Debtors' principals, Arun and Anu, are each personally liable to Sterling on individual guarantees of $2,000,000 based on the prepetition loans.  In the event that the DIP Financing is not approved, and not "rolled up" to repay the Debtors' prepetition indebtedness to Sterling, the Debtors' principals stand to personally owe Sterling $4,000,000.  Moreover, not only are the Debtors' principals potentially liable for the currently outstanding amounts of the prepetition loan from Sterling, but (as the Debtors' moving papers also fail to disclose) Sonia Veluchamy, Arun's wife, has pledged to Sterling substantial funds contained in her trading account as further security for the prepetition loan.  Of course, it is indisputable that under the terms of the DIP Financing, these principals (and their family members) would undoubtedly benefit from their potential liability to Sterling being immediately reduced—as a result of the "roll up" payment and the superpriority protections afforded by the DIP Financing, it would become extremely unlikely that any of their presently outstanding guaranty and/or pledge liability could ever arise.  Plainly, because those

6

who stand to benefit most from the DIP Financing are the Debtors' insiders (and their family members), it is evident that the terms of the DIP Financing as proposed are not made by Debtors exercising true "business judgment," but by their directors exercising truly self-interested behavior. Accordingly, the DIP Financing must be viewed not under a business judgment standard, but under the "entire fairness" standard (i.e., "requiring proof of fair dealing and fair price and terms."). See In re Los Angeles Dodgers LLC, No. 11-12010(KG), 2011 WL 2937905, at *3 (Bankr. D. Del. July 22, 2011) (refusing to apply business judgment rule to proposed financing under Section 364(c), but instead an "entire fairness" standard where the debtor's principal would be personally liable to proposed DIP lender under prepetition credit agreement stating that "[s]uch potential personal liability clearly compromised Debtors'/[prinicpal's] independent judgment. Therefore, Debtors' decision is not entitled to review using the business judgment standard.").

12. Finally, putting aside the fact that the terms of the DIP Financing have not satisfied the standards of Section 364(c), the Debtors are entirely unable to show that the $800,000 that would potentially be available to them under the proposed revolving credit facility would have any material impact on their ability to "stabilize the Borrower's operations to ensure a continuing flow of customer orders." Indeed, the Debtors readily admit that in the two weeks prior to the Petition Date, they had drawn over $3.7 million on their prepetition facility. However, the Schedules and Statement of Financial Affairs of Qualteq, Inc., reveal that the Debtors made no payments to any creditors within the time period between their entry into the facility and the Petition Date (other than retainer payments to their bankruptcy professionals) and, yet, there is less than $900,000 remaining in that entity's bank account. Passing upon the question of just where the missing $2.8 million might be, there is no reason to believe (and the Debtors clearly have made no attempt to explain), that their operations could meaningfully

7

benefit from an additional $800,000 when their own balance sheets reflect that through the period of December 17, 2011, Qualteq will continue to experience positive cash balances and, as of December 17, 2011, will have a net ending cash balance in excess of $350,000.  See In re Phase-I Molecular Toxicology, Inc., 285 B.R. 494, 496 (Bankr. D.N.M. 2002) (denying application for Section 364(c) financing where, among other factors, the short-term of the financing "***rais[ed] concerns that the proposed lending will do little towards preserving assets of the estate***") (emphasis added).

13. Put simply, the Debtors' grounds for seeking the DIP Facility are doubtful, at best, and, in all events, fail to meet even the most basic showings required under Section 364(c) for this Court to approve such a proposal.  When viewed for what it is, there is simply no reason for this Court to permit the Debtors to use the Bankruptcy Code for their own and their lenders' benefit at the expense of their other creditors and parties in interest.

700671163 09290775

**CONCLUSION**

For all of the foregoing reasons, Bank of America respectfully requests that the Court deny the DIP Motion and grant such further relief as the Court deems appropriate.


Dated: October 27, 2011          /s/ Stuart M. Brown
                                 Stuart M. Brown, Esq. (DE Bar No. 4050)
                                 R. Craig Martin, Esq. (DE Bar No. 5032)
                                 DLA PIPER LLP (US)
                                 Wilmington, Delaware 19801
                                 Telephone: (302) 468-5640
                                 Facsimile: (302) 778-7913
                                 stuart.brown@dlapiper.com
                                 craig.martin@dlapiper.com

                                 Thomas S. Kiriakos, Esq. (Pro *Hac Vice*)
                                 Howard J. Roin, Esq. (Pro *Hac Vice*)
                                 Joshua M. Grenard, Esq. (Pro *Hac Vice*)
                                 Mayer Brown LLP
                                 71 South Wacker Drive
                                 Chicago, IL 60606
                                 Telephone: (312) 782-0600
                                 Facsimile: (312) 701-7711
                                 tkiriakos@mayerbrown.com
                                 hroin@mayerbrown.com
                                 jgrenard@mayerbrown.com