IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>QUALTEQ, INC.,<br>d/b/a VCT NEW JERSEY, INC.,[1]<br><br>Debtor. | ) Chapter 11<br>)<br>) Case No. 11-12572 (KJC)<br>)<br>) Jointly Administered<br>)<br>)<br>)<br>) |

## DEBTORS' RESPONSE TO BANK OF AMERICA'S OBJECTION TO MOTION FOR ORDER AUTHORIZING SECURED POSTPETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364

The above captioned debtors and debtors-in-possession (the "*Debtors*") hereby file this response (the "*Response*") to the objection (the "*Objection*") of Bank of America, N.A. ("*BANA*") to the Debtors' motion (the "*Motion*") seeking authorization to obtain secured postpetition financing (the "*DIP Financing*") pursuant to 11 U.S.C. §364. In support of the Response, the Debtors respectfully submit as follows:

## RESPONSE

1. The official committee of unsecured creditors (the "*Committee*") has provided input to the proposed financing order (the "*Proposed DIP Order*"), and supports the relief sought in the Motion. Burr Ridge Bank, one of the Debtors' many cash collateral banks, has also commented on the Proposed DIP Order and should no longer object to the Motion. Skylands Bank, the lender with a first priority in the assets of Veluchamy LLC ("*Veluchamy*"), a guarantor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Qualteq, Inc., d/b/a VCT New Jersey, Inc. (4600); (ii) 1400 Centre Circle, LLC (7091); (iii) 5200 Thatcher, LLC (6991); (iv) 5300 Katrine, LLC (6016); (v) Anar Real Estate, LLC (9267); (vi) Automated Presort, Inc. (0850); (vii) Avadamma LLC (4775; 4800; 4810; 4829); (viii) Creative Automation Company (4350); (ix) Creative Investments, a General Partnership (5992); (x) Fulfillment Xcellence, Inc. (3461); (xi) Global Card Services, Inc. (4581); (xii) Unique Data Services, Inc. (1068); (xiii) Unique Embossing Services, Inc. (1043); (xiv) Unique Mailing Services, Inc. (2594); (xv) University Subscription Service, Inc. (3669); (xvi) Versatile Card Technology, Inc. (5258); (xvii) Veluchamy LLC (3434); and (xviii) Vmark, Inc. (5904).

under the proposed DIP Financing, does not object to the Motion, presumably because its interests in Veluchamy's assets are clearly protected. TD Bank has also reached out to the Debtors requesting modifications to the Proposed DIP Order, and is now supportive of the Motion.[2] And notably, the United State Trustee has not objected to the relief sought in the Motion. In other words, many of the parties that truly have a stake in the relief sought in the Motion have consulted with the Debtors, and have had their legitimate concerns addressed in the Proposed DIP Order.

2. That leaves two objections. First, ABOC, the primary secured lender to Versatile Card Technology, Inc. ("*VCT*"), has filed an objection to the DIP Financing that raises certain issues regarding its position as a cash collateral lender in the VCT estate, including the impact that the administrative claims granted in the Proposed DIP Order could have on ABOC's claims against VCT. As of the filing of this Response, the Debtors have proposed to ABOC modifications to the Proposed DIP Order that should address all of the legitimate issues raised by ABOC with respect to the DIP Financing, and with those changes, the Debtors believe the DIP Financing has no impact on ABOC. The Debtors believe this objection can be resolved prior to the hearing on the Motion, but reserve the right to respond to certain allegations in ABOC's objection.

3. The second outstanding objection was filed by BANA, an objecting party that devotes almost as much space in its Objection justifying why it should even be heard on the Motion as it does slinging baseless and misleading attacks at the proposed DIP Financing. As the defensive nature of BANA's objection suggests, even before reaching the "merits" of the BANA Objection, this Court must decide whether BANA even has the right to be heard in the

---

[2] Jet Lithocolor, Inc. also reached out to the Debtors to resolve certain concerns regarding royalty payments owing to it, which will be addressed in the Proposed DIP Order.

2

above-captioned chapter 11 cases or with respect to the Motion. The unwavering answer to that question is "no."

### A. BANA Lacks Standing to Object to the Motion

4. BANA first argues it has standing under section 1109(b) of the Bankruptcy Code, which provides that "[a] party in interest, including ... a creditor, an equity security holder, or any indenture trustee, may appear and be heard on any issue in a case under this chapter." 11 U.S.C. §1109. The fundamental premise underlying section 1109 of the Bankruptcy Code is that, other than the United States Trustee, which has standing under the Bankruptcy Code, only parties with an economic interest in a proceeding should have a say in how such proceedings reach resolution. See 7 Collier on Bankruptcy P 1109.01 (Lawrence P. King, 15th ed. rev. 1996) ("The general theory behind this section is that anyone holding a *direct financial stake* in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that ultimately shape the disposition of his or her interest") (emphasis added); *In re Ionosphere Clubs*, 101 B.R. 844, 849 (Bankr. S.D.N.Y. 1989) (holding that while the term "party in interest" should be construed broadly, "the party requesting standing must either be a creditor of a debtor to invoke the court's jurisdiction or be able to assert an equitable claim against the estate").

5. Courts have consistently found that entities with no direct economic stake in the outcome of a bankruptcy proceeding have no standing to participate in such proceeding. See *Matter of Goldman*, 82 B.R. 894, 895 (Bankr. S. D. Ohio 1988) (creditors of an estate's creditor are not parties in interest); *In re Lifeco Inv. Group, Inc.*, 173 B.R. at 487 (stating that the purpose of §1109(b) is to place a limit on who can participate in a case in order to make the case manageable); *In re Comcoach Corp. (Roslyn Savings Bank v. Comcoach Corp.)*, 698 F.2d 571 (2d Cir. 1983) (mortgagee not a party in interest entitled to seek relief from automatic stay

3

because neither a creditor or debtor); *In re Ledges Apartments*, 54 B.R. 85 (Bankr. D. Vt. 1985) (bank not a "party in interest" entitled to move to modify automatic stay where it had status of neither debtor nor creditor and sought modification only to proceed against debtor's partnership who guaranteed credit); *In re Baker*, 29 B.R. 174 (Bankr. N. D. Miss. 1983) (assignee of debtor's creditor not a party in interest); *In re Tour Train Partnership (Greg Restaurant Equip. and Supplies, Inc. v. Tour Train Partnership)*, 15 B.R. 401 (Bankr D. Vt. 1981) (judgment creditor of creditor of bankrupt not a "real party in interest" because the judgment creditor was not itself a direct creditor of the bankrupt).

6. BANA has no economic interest in the matter at hand, and has no right to be heard in connection with the Motion. BANA is neither a shareholder nor a creditor of any of the Debtors, and certainly not any of the Debtors affected by the Motion. BANA is not a counterparty to any unexpired leases or executory contracts with the Debtors, has no claim - contingent or otherwise - against any of the Debtors, is not affiliated with any of the Debtors and does not otherwise have any direct financial interest in any of the chapter 11 cases (and in particular, has no interest in the cases of the Debtors who would be parties to the DIP Financing).

7. In a feeble attempt to establish standing, BANA points to certain post-judgment citations to discover assets that it served on the children of the Debtors' founders – Pethinaidu and Parameswami Veluchamy (the "*Veluchamys*") – and certain of the Debtors. In simplified form, BANA maintains that, in an effort to avoid paying a judgment to BANA stemming from litigation in the District Court for the Northern District of Illinois, the Veluchamys fraudulently transferred assets to their children (often through several steps) and that some of these assets were later used to purchase equity interests in or provide funding to the Debtors. Consequently, BANA concludes that by virtue of certain potential fraudulent transfer causes of action with

4

respect to the Veluchamys, it may have an interest in certain of the Debtors, and therefore, it has a say in these chapter 11 cases.[3]

8. The fundamental flaw in BANA's theory lies in the chapter 7 bankruptcy proceeding that the Veluchamys have filed in the Northern District of Illinois. A chapter 7 trustee (the "*Chapter 7 Trustee*") has been appointed in that case, and absent a grant of derivative standing by the bankruptcy court in the chapter 7 case, any derivative causes of action – including causes of action relating to the improper transfers of assets from the Veluchamys – belong to and can only be pursued by the Chapter 7 Trustee for the benefit of all creditors of the Veluchamys. See 11 U.S.C. § 544 (granting trustee the powers of, among other things, a hypothetical judicial lien creditor, to "avoid any transfer of property of the debtor"); *see also, e.g.*, *BRS Associates, L.P. v. Dansker*, 246 B.R. 755, 772 (S.D.N.Y. 2000) ("Where the trustee has standing to sue, the automatic stay prevents creditors or shareholders from asserting the claim notwithstanding that outside of bankruptcy, they have the right to do so.") (citations omitted); *PHP Liquidating, LLC v. Robbins, et al., (In re PHP Healthcare Corp.)*, 128 Fed. Appx. 839, 844-845 (3d Cir. 2005) (finding that an individual creditor of a debtor may not assert a claim for fraudulent transfer belonging to all creditors); *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d

---

[3] BANA asserts that it has a perfected security interest in fraudulent conveyance actions against the Veluchamys. While the existence of any such alleged lien is irrelevant to the standing issue (as BANA has not exercised its rights to foreclose on any such lien), under Illinois law, which would govern whether BANA had a perfected security interest in any fraudulent conveyance actions, BANA's citations do not extend to personal property purportedly transferred prior to the entry of the judgment against the Veluchamys in December 2010, but can only attach to property owned or actually controlled by the judgment debtor at the time of service of the citations. *See American National Bank and Trust Co. of Chicago v. Vinson*, 273 Ill.App.3d 541, 544 (1st Dist. 1995). Under 735 ILCS 5/2-1402, which governs citation liens, a lien extends only to "choses in action," which are actions that are in the process of being litigated. *See Gonzalez v. Profile Sanding Equipment, Inc.*, 333 Ill.App.3d 680, 694 (1st Distr. 2002). Because no causes of action for fraudulent transfer had been initiated under Illinois prior to BANA's issuance of the citations, its liens cannot extent to any future fraudulent transfer actions. Moreover, and perhaps more fundamentally, a fraudulent transfer action is not "personal property" of a debtor that can be subject to a citation lien. Indeed, it is well settled law that a fraudulent transfer cannot be set aside by the granting party (i.e., the debtor). *See American National Bank and Trust Co. of Chicago*, 273 Ill.App.3d at 544. Those causes of actions belong to the debtor's creditors, which, as discussed in the body of this Response, belong to the Chapter 7 Trustee in the Veluchamys' chapter 7 bankruptcy case.

164, 169 (3d Cir. 2002) ("Once a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.'") (citation omitted); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 554 (3d Cir. 2003) (absent a grant of derivative standing, only a trustee or debtor in possession may pursue claims under 11 U.S.C. § 544); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 850 (Bankr. S.D.N.Y. 1994) (enjoining creditor lawsuits against non-debtor third parties to recover assets allegedly fraudulently transferred by the debtor and holding that "the trustee alone" has the authority to assert claims to recover property under 11 U.S.C. § 544).

9. In this case, absent a proper grant of derivative standing in the chapter 7 bankruptcy, the only party that possibly has standing to assert claims to recover assets that the Veluchamys allegedly improperly transferred is the Chapter 7 Trustee on behalf of all of the Veluchamys' creditors. BANA is thus not a creditor of the Debtors, and is not otherwise a "party in interest" with a direct financial stake in these cases.

10. While BANA presumably has a direct financial stake in the Veluchamys' personal bankruptcy, it plainly does not have a direct financial stake in (or standing to assert claims in) the Debtors' Chapter 11 Cases. To the extent any party has a direct financial stake in these cases based on alleged fraudulent transfers made by the Veluchamys it would be the Chapter 7 Trustee. *See, e.g., In re JMP-Newcor Int'l*, 225 B.R. 462, 464 (Bankr. N.D. Ill. 1998) (creditor that had assigned its claim no longer had a direct economic interest and was thus no longer a party in interest, even where assignment agreement provided that creditor would share in any recovery obtained by the assignee); *In re WHET, Inc.*, 33 B.R. 438, 440 (Bankr. D. Mass. 1983) (equity holder of debtor was not party in interest in corporate bankruptcy proceeding

where equity holder had filed for bankruptcy and his equity interests thus vested in the chapter 7 trustee).

11. BANA further asserts standing on the basis of "certain payments" it received from "Qualteq" within the 90 days leading to the bankruptcy filing, arguing that as a result it *could be* subject to a hypothetical avoidance action in the future. Not only has BANA failed to identify the payments it received, but has also failed to identify the Debtor-parties from whom payment was received.[4] The Debtors are aware of two payments from a Debtor entity to BANA within the 90-day preference period. The first is from Debtor Unique Data Services, Inc. in May of 2011 in a total amount of $1,559,365.08, which paid off two secured loans – one, an equipment loan and the other a line of credit. The second is a payment in the amount of approximately $268,890.02 in July of 2011 from VCT-NJ, which was also on account of a secured equipment loan.[5]

12. While BANA attempts to manufacture standing on the basis of the foregoing payments, it is blackletter law that there is no preference exposure to a secured creditor that receives payment on account of a fully secured loan. *See* 11 U.S.C. §547(b); *see also In re Powerine Oil Co.*, 59 F.3d 969 (9th Cir. 1996) (holding that a payment to a fully secured creditor is not preferential); *In re J. Silver Clothing, Inc.*, 453 B.R. 518, 533 (Bankr. D. Del. 2011); *In re USA Detergents, Inc.*, 418 B.R. 533, 542 (Bankr. D. Del. 2009); *In re Radnor Holdings, Corp.*, 353 B.R. 820, 847 (Bankr. D. Del. 2006); *In re Cavalier Industries, Inc.*, 2002 WL 975868 (Bankr. E.D. Pa. 2002).

---

[4] The term "Qualteq" is undefined in the Objection.
[5] Ironically, BANA questions where nearly $2,800,000 from the Sterling prepetition loan was spent. The payment from VCT-NJ to BANA in July 2011 was funded directly from the Sterling loan. The Debtors also refinanced an outstanding loan with TD Bank, which accounts for the remainder of the Sterling prepetition loan.

7

13. Thus, the Debtors are not aware of any basis for seeking a clawback of any payments to BANA on preference grounds. BANA's supposed potential "preference" exposure is a very thinly veiled attempt to fabricate standing when its lack of any legitimate interest in these cases is so plainly obvious. BANA has no economic or any other interest whatsoever in the relief sought in the Motion, and is simply interjecting itself into this proceeding to advance its own unrelated litigation tactics.

### B.  Objections Are Without Substantive Merit

#### (i)  Alternative DIP Financing Options

14. BANA argues that the borrower -- Qualteq, Inc. (d/b/a VCT New Jersey, Inc.) ("*VCT-NJ*") -- has made no showing that it could not obtain financing on less onerous terms. What BANA fails to note is that the terms of the DIP Financing effectively mirror the terms of the prepetition financing between VCT-NJ and Sterling Bank ("*Sterling*"), except that the applicable interest rates increase slightly under the DIP Financing, and that the borrowing base has been loosened to provide VCT-Inc. with increased borrowing availability. In that regard, the DIP Financing essentially reflects market terms for a company that is not in bankruptcy.

15. It is difficult to imagine a more debtor-friendly postpetition financial accommodation. The revolving loan accrues interest at the Wall Street Journal Prime Rate plus 2.0%, and the term loan at 7.0%. This is only slightly higher than the prepetition rates of the Wall Street Journal Prime Rate plus 0.75% and 6.0%, respectively. There are essentially no fees associated with the DIP Financing, and in fact, Sterling has expressly waived an early termination fee that it was previously entitled to in order to assist in facilitating an exit from chapter 11 for VCT-NJ.[6] The DIP Financing does not prime any secured lender, and Sterling's

---

[6] The DIP Financing contemplates a marginal $350 monthly collateral maintenance fee.

liens and administrative claims are expressly subordinated where necessary to protect the interests of other secured creditors, including ABOC. There are no waivers of claims by the estate under section 506(b) of the Bankruptcy Code.

16. The Committee (and ABOC under a revised form of order to be filed with the Court prior to the hearing) retain the right to challenge Sterling's prepetition liens and claims throughout the pendency of the bankruptcy cases, while all other third parties have until January 17, 2012 to do so. In that regard, the waivers of claims and releases in the Proposed DIP Order essentially do not bind the Committee (or ABOC), and only bind other parties in interest after a lengthy investigation period. The DIP Financing is designed to model the prepetition terms between the parties, which was a deal that closed only weeks prior to the bankruptcy filing. Given the proximity to the bankruptcy petition date in which the Sterling prepetition loan closed, it is unlikely that there can be a better barometer for the state of the market. This is particularly true in this case where Sterling, as discussed in greater detail below, would not have agreed to the use of cash collateral on a final basis, or on interim basis to allow VCT-NJ to shop for postpetition financing.

17. Moreover, the "roll up" feature of the DIP Financing, which BANA complains of, is greatly tamed by the lengthy period during which parties in interest can investigate the prepetition liens and claims of Sterling, which again, in the case of the Committee and ABOC, lasts for the balance of the chapter 11 cases. To the extent Sterling's prepetition liens and claims are invalidated, Sterling's postpetition liens would also be invalidated.

18. Thus, while in the typical chapter 11 case a roll up may be controversial, the Debtors submit that in this case, the roll up is not prejudicial to any parties in interest, and in

9

particular, not with respect to BANA, who has its own litigation-related motives that go far beyond the Motion, and who has no interest with respect to the DIP Financing.

19. While the BANA would lead this Court to believe that the DIP Financing is somehow "not market" or otherwise in the best interests of the Debtors' estates, the reality is that the DIP Financing in essence contains *non-bankruptcy* market terms and is supported by the Debtors' sound business judgment.

### (ii) Intercompany Loans Cannot Be Used to Fund Operations

20. BANA also suggests that VCT-NJ could fund its operations from intercompany loans as cash needs arise. While this is a practice the Debtors have employed historically to address immediate cash needs, this practice has been largely curtailed since the bankruptcy filing, primarily at the insistence of the Committee as well as the Debtors' numerous cash collateral banks. Indeed, shortly after its appointment in these cases, the Committee expressed concern about the prospect of substantial intercompany transfers of cash. Accordingly, the Debtors agreed to give the Committee advance notice of any potential intercompany loans, effectively making postpetition intercompany transfers during these cases the exception rather than the rule. In fact, even before the Committee's appointment, the Debtors had no plans to engage in substantial intercompany loans other than to address immediate cash needs resulting from the bankruptcy filing.

21. Moreover, as this Court is aware, the Debtors are operating under numerous orders authorizing them to use the cash collateral of their many prepetition secured lenders. Many of these orders expressly prohibit intercompany transfers absent consent of the applicable cash collateral lender and the Committee.[7] And in all cases, as is customary, the applicable

---

[7] See e.g., Third Interim Order Authoring Use of Cash Collateral in Which Sterling Bank Asserts an Interest dated October 6, 2011; Final Order Authorizing Global Card Services, Inc. to Use Cash in Which Burr Ridge Bank

10

Debtor's expenditure of cash collateral is strictly tied to a budget, none of which contemplate intercompany transfers outside the ordinary course of business (i.e., aside from ordinary trade payables between Debtors). As these restrictions were specifically bargained for by the various cash collateral lenders in order to protect their collateral, it is extremely unlikely that any of these lenders would consent to any significant, unbudgeted intercompany transfers. Consequently, relying on intercompany loans to fund VCT-NJ during these cases would be practically difficult at best and impossible at worst.

### (iii) DIP Financing Supported by Sound Business Judgment

22. BANA has also questioned the Debtors' business judgment in seeking approval of the DIP Financing. As set forth in greater detail in the Motion, the Debtors' Chief Restructuring Officer believes there are numerous reasons why the DIP Financing makes sound business sense. First, VCT-NJ has cash needs to fuel the operation of its business, which, prior to its bankruptcy filing was in the midst of a period of growth. Having access to a revolving line of credit will facilitate VCT-NJ's ability to service increased sales volume during peak periods of its operations. The DIP Financing also assures VCT-NJ's customers and vendors that the company has the support of its lender during the chapter 11 process and will be able to adequately finance its operations going forward.

23. Moreover, having the ability to pay down its line with Sterling in the ordinary course will allow VCT-NJ to avoid unnecessary interest expense throughout the case. Additionally, the rates under the DIP Financing are significantly lower than the default rate that would otherwise accrue, as Sterling is very likely oversecured in its collateral. Indeed, under the prepition loan documents, there is an approximately 5.0% spread between the contract rate and

---

Asserts an Interest dated October 6, 2011; Final Order Authorizing Use of Cash Collateral in Which Amalgamated Bank of Chicago Asserts an Interest, dated October 6, 2011; Final Order Authorizing Use of Cash Collateral in Which Inland Bank and Trust Asserts an Interest, dated October 6, 2011.

11

the default rate, which would cost VCT-NJ over $160,000 in unnecessary interest expense on an annual basis, a substantial figure for a company of VCT-NJ's size.

24. Importantly, the DIP financing also allows VCT-NJ to normalize relations with Sterling following the bankruptcy filing, and to stabilize its business operations at a time when stability and predictability are paramount to the Debtors. Following the bankruptcy filing, relations between the Debtors and Sterling were badly soured given the closing of the prepetition loan just weeks prior to the bankruptcy petition date. Under these circumstances, Sterling was not amenable to negotiating use of cash collateral on a final basis, unlike the other lenders in these cases. The uncertainty surrounding VCT-NJ's relationship with the party holding direct control over VCT-NJ's ability to finance its operations posed a real and credible threat to VCT-NJ's estate.

25. Nevertheless, instead of taking a hostile posture and seeking to significantly derail the business operations of a key Debtor entity, Sterling approached the Debtors about doing a postpetition financing to reaffirm the prepetition loan agreement, and normalize relations between the parties. The Debtors and their Chief Restructuring Officer firmly believe in their business judgment that going forward on a consensual basis with Sterling and engendering a harmonious relationship between the parties is the best and least disruptive path forward for VCT-NJ, particularly because there is almost no added burden on the Debtors by entering into the DIP Financing and substantial cost savings.

### (iv) Allegations That DIP Financing Benefits Insiders Patently Untrue

26. In that light, allegations by BANA that the DIP Financing is proposed simply to benefit insiders of the Debtors is wholly removed from reality, and rebutted by the plain face of the loan documents attached to the Motion. Indeed, these bold allegations are nothing more than

malicious pot-shots that have absolutely no evidentiary support, and are designed to mislead this Court and other parties in interest.

27. In the Assumption Agreement, Amendment to Loan and Security Agreement and Amendment to Other Loan Documents dated October 17, 2011 (the "*DIP Amendment*") attached to the Motion as Exhibit D, each of the "insiders" – Arun Veluchamy, Anu Veluchamy, and Sonia Veluchamy – expressly and unequivocally "affirms and reaffirms" their respective guaranty and pledge agreements, as applicable, executed in connection with the prepetition loan documents. Thus, the Debtors' insiders are fully obligated under the DIP Financing to the same extent as they are with respect to the prepetition obligations. In fact, and completely contrary to BANA's false assertions, the effect of the DIP Amendment is to make certain of the insiders *more* liable to Sterling under the DIP Financing with respect to their pledges in the amount of approximately $400,000 from their personal assets.

28. Sterling has made clear throughout the course of negotiations that the guarantees and pledges of the Debtors' insiders are key protections for the bank that could in no way be diluted (and in fact have been enhanced) as part of the DIP Financing. To advance negotiations, the Debtors' Chief Restructuring Officer requested that the Debtors' insiders to reaffirm their obligations under the DIP Financing to the full extent of their prepetition obligations. Thus, BANA's allegations that the DIP Financing is a sweetheart deal for the Debtors' insiders are misplaced and entirely without merit, much like the rest of its objections.

### (v) Sterling and the Chief Restructuring Officer, Not the Insiders, Proposed DIP Financing

29. While BANA would like to believe there is a grand conspiracy at work to insulate the insider guarantors and pledgors from their prepetition liability, the reality is that Sterling was the initial proponent of the DIP Financing at the early stages of these cases, and the Debtors and

13

their Chief Restructuring Officer agreed to proceed with the DIP Financing only after discussing possible terms and determining that there were significant business justifications for moving forward. While Sterling had the right and the ability to enforce its third-party rights following the bankruptcy filing, it chose, in its business judgment, to reaffirm the parties' relationship on a normalized, going-forward basis instead.

30. For the foregoing reasons, the Debtors respectfully ask this Court to overrule the BANA's objections, and grant the relief requested in the Motion, as set forth in the Proposed DIP Order.

Dated: October 31, 2011
       Wilmington, Delaware

                       FOX ROTHSCHILD LLP

                       Jeffrey M. Schlerf (DE Bar No. 3047)
                       Eric M. Sutty (DE Bar No. 4007)
                       L. John Bird (DE Bar No. 5310)
                       Citizens Bank Center, Suite 1300
                       919 North Market Street
                       Wilmington, Delaware 19801
                       Telephone: (302) 654-7444
                       Facsimile: (302) 656-8902

                       -and-

                       GOLDSTEIN & McCLINTOCK LLLP
                       Harley J. Goldstein, Esq. (*Pro Hac Vice*)
                       Matthew E. McClintock, Esq. (*Pro Hac Vice*)
                       980 North Michigan Avenue, Suite 1400
                       Chicago, Illinois 60611
                       Telephone: (312) 337-7700
                       Facsimile: (312) 227-2305

                       *Co-Counsel for the Debtors and*
                       *Debtors in Possession*